J-S37004-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL J. DUNCAN | |
| Appellant | No. 237 WDA 2015 |

Appeal from the Judgment of Sentence March 2, 2012
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-CR-0000357-2011

BEFORE:  GANTMAN, P.J., SHOGAN, J., and LAZARUS, J.

MEMORANDUM BY GANTMAN, P.J.:                     **FILED JULY 07, 2016**

Appellant, Michael J. Duncan, appeals *nunc pro tunc* from the judgment of sentence entered in the Washington County Court of Common Pleas, following his jury trial convictions for first-degree murder and criminal conspiracy.[1]  We affirm.

This Court previously set forth the relevant facts of this case as follows:

> John Lynn Newman [("Victim")] was shot to death on February 3, 2003, in California, Pennsylvania.  On January 24, 2012, a jury found that [Victim's] death was the result of a conspiracy and/or solicitation between John Ira Bronson, Jr. [("Codefendant")] and Appellant].  Any complete summary of the facts for the intervening nine

_____

[1] 18 Pa.C.S.A. §§ 2502(a), 903, respectively.

years must begin with the circumstances that led to this conspiracy and/or solicitation.

In 2002, [Victim] was approached by the PSP [(Pennsylvania State Police)] and informed "that he had been investigated and [that] felony drug charges against him [were] pending." In October of that year, Trooper Aaron Borello ("Trooper Borello") approached [Victim] about becoming a confidential informant ("CI") for the PSP. Trooper Borello and [Victim] then set about performing a buy/bust involving [Victim's] supplier, [Codefendant]. After [Codefendant] was observed selling 200 pills of Oxycodone to [Victim], [Codefendant] was arrested. The PSP searched [Codefendant's] home and found about $384,000 in cash which was seized.[1]

> [1] [Codefendant] eventually pled guilty to [federal charges of] drug trafficking and was incarcerated.

After his arrest, [Codefendant] began acting as a C.I., first with the PSP and then for the [FBI]. While working with the PSP, [Codefendant] asked Trooper Borello directly if it was [Victim] who had informed on him. Unfortunately, [Codefendant's] participation as a C.I. was fruitless and ended "within a week" prior to [Victim's] death.

At some point after [Codefendant's] arrest, [Appellant] spoke with his associate, Howard Irwin ("Irwin"), about another man, "[Michael] Bowman [("Bowman"),] having some type of hookup where he [could] make some money…taking care of [an unnamed] snitch." Irwin then witnessed, at his home, a meeting between [Appellant], [Codefendant], and Bowman, a drug dealer and associate of [Codefendant]. During the meeting, [Codefendant] asked [Appellant] to kill [Victim] and [Appellant] agreed. [Codefendant] asked Bowman to cooperate in the killing, but Bowman declined.

Prior to [Victim's] death, Robert Bedner ("Bedner") called Brian Dzurco ("Dzurco"). Phone records revealed that the call occurred on January 20, 2003, about two weeks before the death of [Victim]. Bedner put [Codefendant] on the phone with Dzurco[.] [Codefendant] asked Dzurco to set up a meeting with [Victim]. Dzurco agreed because he

believed the matter to be related to a drug debt. After receiving information that the meeting might be fatal for [Victim], Dzurco chose not to arrange it. Shawn Geletei ("Geletei") testified that, while in jail, [Appellant] approached him and bragged about his intention to murder [Victim]. He recalled that the conversation was prior to [Victim's] death. Geletei specifically testified:

> [Appellant] come over and asked if I knew [Victim]. I said, yeah. He says, I'm going to take his ass out. And he started saying something about [Codefendant] and drugs and all this. I said, I'm only in here [in jail] for child support, I don't want to get involved in this. And he kept on running his mouth saying about him being a monster and taking people out before and all this.

Through phone records and witness testimony, the following timeline of February 3, 2003, being the day of the killing, was revealed:

At 7:32 p.m.[,] a call was made from [Victim's] cell phone to Brian Horner ("Horner"), which lasted 3 minutes and 19 seconds. Sometime before 8:00 p.m.[,] [Victim] asked his wife for $300.00, ostensibly for cartons of cigarettes, but was, most likely, to buy heroin. At 7:56 p.m.[,] a call was made from [Victim's] cell phone to Horner, which lasted 1 minute and 9 seconds. Sometime after receiving the money, [Victim] left the house. He met Geletei in the alley between their houses to discuss acquiring Oxycodone. Geletei told [Victim] that he could not locate any Oxycodone. [Victim] told Geletei that he was going to meet Horner.

Upon returning home, [Victim] informed his wife that Horner needed a ride and he left again. At 8:08 p.m.[,] [Victim] called a drug client named Amelia Pajerski ("Pajerski"). At approximately 8:30 p.m.[,] [Victim] sold Pajerski stamp bags of heroin. He told Pajerski that the heroin was from Horner. Pajerski specifically recalled being home in time to watch a favorite show by 9:05 p.m. At approximately 9:00 p.m.[,] [Victim's] daughter heard the distinctive sound of her father's car pass by their house. At 9:03 p.m.[,] [Victim] called Geletei's landline,

which lasted for 6 seconds. Thereafter, [Victim] was killed by a bullet fired at close range while he was sitting in his car, which was parked down the street from his home.

Next, the record reveals the events of February 4, 2003, as follows: Early in the morning, [Victim's] daughter noticed his car parked down the street from their house. She observed her father inside the car, but the car door was locked. Upon returning to the car with Mrs. Newman, they found [Victim] dead and contacted the authorities. The police searched the scene and located a spent bullet casing inside the car, and an unfired cartridge outside of the vehicle. [Victim] had $115.00 in cash, a marijuana "roach", a cell phone, and ten packets of heroin. Around 12:00 p.m.[,] Ryan Givens called [Appellant] to inform him that [Victim] had been killed, to which [Appellant] responded, "snitches get dealt with." The authorities took Horner in for questioning and tested his hands for gunshot residue. The results allowed the tester to state "that [Horner] could have fired a gun, could have come in contact with something that had gunshot primer residue on it," or "that [Horner] was in very close proximity to a firearm when it was discharged."

It took several years for charges to be filed in this "cold case[."] The relevant events of the years are summarized herein:

In March, 2003, Irwin asked [Appellant] to wire money to him while on vacation. The money, being $931.00, was transferred on March 10, 2003. Also in early March, [Appellant] appeared early one morning at the home of his drug associate, Gerald Hull ("Hull"). Hull's home was used to cook and store crack cocaine. [Appellant] opened a safe located within the Hull residence, to which only he and Irwin had access. At that time, [Appellant] was heard making a call. The exact nature of the call was unclear. However, Hull, who was admittedly high on crack at the time, recalled hearing [Appellant] speak about shooting someone. [Appellant], who appeared "giddy, nervous, [and] agitated," pointed a gun in Hull's face before leaving. When Irwin later returned from vacation, he discovered that [Appellant] had "disappeared[."] Irwin f[ound] that the safe had been emptied. The safe's contents, being

- 4 -

money, drugs and a nine millimeter (9 mm) pistol, were missing, and only a cell phone was left behind.

In April of 2003, while on furlough, Bowman spoke with [Appellant], who told Bowman that he killed [Victim], and explained the manner in which he did it. [Appellant] told Bowman that he was in the rear of [Victim's] car and shot him in the left ear. Between April and June of 2003, Bowman had a three-way call with a woman and [Appellant]. Again, [Appellant] admitted that he killed [Victim].[2]

> [2] The [trial court] notes that the testimony regarding this call was elicited from Bowman on cross-examination. Defense counsel asked Bowman "you are saying…that [Appellant] made a three-way call in a recorded jail call where he goes, yeah, that's right, I killed that guy; is that what you are saying to the jury?" Bowman answered "That's exactly what I'm telling the jury."

In September of 2003, PSP Trooper James Monkelis ("Trooper Monkelis") and Trooper Beverly Ashton ("Trooper Ashton") interviewed [Appellant]. [Appellant] denied having ever been in California, PA, and denied knowing [Victim]. When told of [Victim's] death, [Appellant] said that he did not "whack" him, despite not being told the nature of [Victim's] death.[3] [Appellant] also identified [Victim] as a snitch. [Victim's] role as a C.I. had not been released to the public. [Appellant] made other inculpatory statements, such as:

1. Stating that "hypothetically" someone, implying [Victim], owed someone else, implying [Codefendant], a lot of money.

2. Stating that he could not do the time and worrying that he would rather not be ["]45, 46 or 46, 47 at the clubs."

3. In response to the interviewer stating that it might have been self-defense, [Appellant] stated "come on, man, you seen that crime scene, it couldn't have been self[-]defense."[4]

3 The [trial court] notes that it was public knowledge that [Victim] had been killed.

[4] The [trial court] notes that no crime scene photos had been released at the time of the interview.

In late 2003, a former corrections officer, Eric DeLong ("DeLong"), encountered [Appellant] in a bar. DeLong overheard [Appellant] state, "yeah, I popped that guy in the back of the head [in] California." A few days later, DeLong reported this incident to the PSP, who put him in touch with the FBI. Despite this report, DeLong "didn't hear anything for, approximately, seven years." Approximately two and a half years after Irwin first discovered that [Appellant] had fled California, PA, he finally spoke to [Appellant]. When Irwin asked [Appellant] why he had left California, PA, [Appellant] gave his reasons, admitting to killing [Victim] and also to Horner's involvement. [Appellant] told Irwin that "Brian Horner was running [Appellant's] name about being involved in the homicide and [Horner] was actually the one that...brought [Victim] out [of] the house and…brought him to the car. And [Appellant] was in the car and [Appellant] whacked [Victim]." [Appellant] went on to tell Irwin that he "whacked," or killed, [Victim] because he was a "snitch".

In January 2011, [Appellant] was arrested in Amherst, Ohio. He was interviewed again by Trooper Monkelis[,] and again made inculpatory statements. [Appellant] stated that "snitches get dealt with." He stated that "he never owned or carried that caliber of a weapon."[5] After the interview, [Appellant] was transported back to Pennsylvania. [Appellant], while en route, spoke in further detail about his views on snitches, saying that even "God doesn't like snitches."

In August of 2011, [Codefendant] was housed in the Washington County Correctional Facility ("WCCF") in connection with being charged in this case. In December of 2011, [Codefendant] admitted to Michael McCarthy, a fellow inmate, that he attended the 2002 meeting…at Irwin's house. [Codefendant] admitted that the meeting concerned "offing[,"] or killing, [Victim]. McCarthy then reported the conversation to the authorities.

> [5] The [trial court] notes that the caliber of the weapon [had not been] released.

***Commonwealth v. Duncan***, No. 541 WDA 2012, unpublished memorandum at 1-6 (Pa.Super. filed October 30, 2014).

On January 13, 2011, the Commonwealth charged Appellant, Codefendant, and Howard Irwin with first-degree murder and criminal conspiracy. The Commonwealth filed a motion to consolidate the three cases, which the trial court granted.[2] On September 22, 2011, Appellant filed two motions to suppress out-of-court statements, which the court granted in part and denied in part on November 2, 2011. On December 19, 2011, the Commonwealth filed a motion *in limine* seeking to restrict Appellant's cross-examination of certain witnesses, which the court granted on December 29, 2011. On January 24, 2012, a jury convicted Appellant of first-degree murder and conspiracy. The court sentenced Appellant on March 2, 2012, to life imprisonment for first-degree murder, plus a consecutive term of fifteen (15) to thirty (30) years' incarceration for conspiracy. Appellant timely appealed, and this Court affirmed the judgment of sentence on waiver grounds because Appellant's court-ordered Pa.R.A.P. 1925(b) statement was insufficiently concise. ***See id.*** On December 3, 2014, Appellant *pro se* filed a timely petition under the Post Conviction Relief

---

[2] Howard Irwin subsequently entered a guilty plea.

Act ("PCRA").[3]  The PCRA court appointed counsel, who filed an amended petition seeking restoration of Appellant's direct appeal rights *nunc pro tunc*. The court granted the requested relief on January 30, 2015.  On February 6, 2015, Appellant filed a timely notice of appeal *nunc pro tunc*.  On that same date, the court ordered Appellant to file a Rule 1925(b) statement.  After the court granted two extensions, Appellant timely complied.

Appellant raises the following issues for our review, which we have reordered for ease of disposition:

> I.  WHETHER THE TRIAL COURT ERRED WHEN IT STATED THAT THE SUPERIOR COURT HAD PREVIOUSLY ADDRESSED THE MAJORITY OF APPELLANT'S CLAIMS ON APPEAL?[4]
>
> II.  WHETHER THE TRIAL COURT ERRED WHEN…APPELLANT WAS NOT PERMITTED TO TESTIFY TO ALIBI EVIDENCE DURING HIS DIRECT EXAMINATION?
>
> III.  WHETHER THE TRIAL COURT ERRED IN GRANTING THE COMMONWEALTH'S MOTION *IN LIMINE*?

_____

[3] 42 Pa.C.S.A. §§ 9541-9546.

[4] In Appellant's first appeal, this Court determined Appellant had waived all issues because prior appellate counsel had filed an excessively long and vague Rule 1925(b) statement.  The PCRA court then reinstated Appellant's direct appeal rights *nunc pro tunc* based on prior counsel's ineffective assistance with respect to his failure to file a proper Rule 1925(b) statement. Under these circumstances, where Appellant was effectively deprived of his right to a direct appeal, this Court's previous disposition does not preclude merits review of any claims Appellant raises in the instant appeal.  **See Commonwealth v. Halley**, 582 Pa. 164, 870 A.2d 795 (2005) (stating duplicative review is permissible following reinstatement of defendant's direct appeal rights *nunc pro tunc* on ground that counsel was ineffective for failing to perfect direct appeal).  Thus, we dispose of Appellant's first issue.

IV. WHETHER THE COMMONWEALTH COMMITTED MISCONDUCT WHEN IT FAILED TO PRODUCE AND DESTROYED THE VICTIM'S CONFIDENTIAL INFORMANT FILE?

V. WHETHER THE VERDICTS OF GUILTY WERE AGAINST THE WEIGHT OF THE EVIDENCE?

VI. WHETHER THE TRIAL COURT ERRED WHEN IT DISCOVERED THAT A JUROR HAD OUTSIDE COMMUNICATION WITH AN ATTORNEY REGARDING THE TRIAL?

VII. WHETHER THE EVIDENCE PRESENTED WAS SUFFICIENT TO CONVICT…APPELLANT OF CRIMINAL HOMICIDE AND CONSPIRACY?

VIII. WHETHER THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTIONS TO SUPPRESS?

IX. WHETHER THE COMMONWEALTH COMMITTED MISCONDUCT WHEN IT FAILED TO DISCLOSE TO THE JURY THAT A WITNESS WAS OFFERED IMMUNITY TO PROSECUTION IN EXCHANGE FOR HIS TESTIMONY?

X. WHETHER THE TRIAL COURT ERRED IN GRANTING THE COMMONWEALTH'S MOTION TO JOIN/CONSOLIDATE [APPELLANT'S] TRIAL WITH…CO-DEFENDANT?

(Appellant's Brief at 5).

In his second issue, Appellant argues his personal testimony regarding his whereabouts on the night of the murder was admissible despite his failure to file a notice of intent to present an alibi defense pursuant to Pa.R.Crim.P. 567. Appellant contends the lack of Rule 567 notice would justify exclusion only of alibi evidence other than Appellant's own testimony. Appellant concludes the trial court's exclusion of his alibi testimony was

highly prejudicial and warrants a new trial.  We cannot agree.

"The admission or exclusion of evidence is within the sound discretion of the trial court and will not be reversed absent a clear abuse of that discretion."  ***Commonwealth v. Rosarius***, 771 A.2d 29, 32 (Pa.Super. 2001).  An alibi is "a defense that places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for him to be the guilty party."  ***Commonwealth v. Kolenda***, 544 Pa. 426, 431, 676 A.2d 1187, 1190 (1996).  Pennsylvania Rule of Criminal Procedure 567 states in relevant part:

> **Rule 567.  Notice of Alibi Defense**
>
> **(A) Notice by Defendant.**  A defendant who intends to offer the defense of alibi at trial shall file with the clerk of courts not later than the time required for filing the omnibus pretrial motion provided in Rule 579 a notice specifying an intention to offer an alibi defense, and shall serve a copy of the notice and a certificate of service on the attorney for the Commonwealth.
>
> (1) The notice and a certificate of service shall be signed by the attorney for the defendant, or the defendant if unrepresented.
>
> (2) The notice shall contain specific information as to the place or places where the defendant claims to have been at the time of the alleged offense and the names and addresses of the witnesses whom the defendant intends to call in support of the claim.
>
> **(B) Failure to File Notice.**
>
> (1) If the defendant fails to file and serve the notice of alibi as required by this rule, the court may exclude entirely any evidence offered by the defendant for the purpose of proving the defense, **except testimony by the**

> **defendant**, may grant a continuance to enable the Commonwealth to investigate such evidence, or may make such other order as the interests of justice require.
>
> * * *

Pa.R.Crim.P. 567 (emphasis added). "Although an alibi defense is generally presented with accompanying alibi witnesses or other evidence placing the defendant at a place other than the scene of the crime at the time of its commission, the testimony of the accused may, by itself, be sufficient to raise an alibi defense and entitle him to an appropriate jury instruction." *Commonwealth v. Pounds*, 490 Pa. 621, 631-32, 417 A.2d 597, 602 (1980). Where an alibi defense is raised and counsel requests the relevant jury instruction, "The strength of the Commonwealth's case does not render the absence of an instruction harmless error." *Commonwealth v. Kolenda*, 544 Pa. 426, 432, 676 A.2d 1187, 1190 (1996).

Instantly, Appellant testified at trial in his own defense. Defense counsel asked Appellant where he was on the night Victim was killed. Appellant said he went to a strip club. When defense counsel asked Appellant what time he went there, the Commonwealth objected and the following exchange occurred at sidebar:

> [COMMONWEALTH]: We had no notice of alibi in this case. The date of death has been in discovery and known since 2003. We cannot get into this. It's improper. It's impermissible, frankly. We can't do it.
>
> [DEFENSE COUNSEL]: Just to talk about whether he was [at the strip club] that evening is not impermissible.

THE COURT:                    You already said that he was at some strip club.  I still don't know the name of it.

[DEFENSE COUNSEL]:      Filly Corral.

THE COURT:                    Where is that?

[COMMONWEALTH]:        It's in New Stanton.

THE COURT:                    I don't know.  I never heard of that.  You can't go any further on that subject.

[DEFENSE COUNSEL]:      We will move ahead.

THE COURT:                    You can't go any further without notice.

[DEFENSE COUNSEL]:      We will move ahead.

(N.T. Trial, 1/23/12, at 1845-46).  Shortly thereafter, defense counsel again elicited testimony from Appellant regarding his whereabouts on the night of the homicide.  Appellant testified that he went to Gerald Hull's house "between 3:00 [a.m.] and 4:00 [a.m.] or 4:30 [a.m.]"  *Id.* at 1850. Appellant further stated: "I had stopped at Denny's to get something to eat after I left the strip club, Denny's in Belle Vernon.  I left the strip [club] around 2:00, 2:30 in the morning, so it had to be around 4:00 [a.m.]"  *Id.* The Commonwealth again objected to Appellant's alibi testimony, based on lack of Rule 567 notice, and requested a cautionary instruction.  At sidebar, the following discussion took place:

[COMMONWEALTH]:        My objection still stands.

[DEFENSE COUNSEL]:      I understand what [the Commonwealth] is saying.

- 12 -

[COMMONWEALTH]:   You just gave [Appellant] an alibi for the entire --

[DEFENSE COUNSEL]:   Who should I respond to first?

THE COURT:   And then where after Denny's?

[COMMONWEALTH]:   Gerald Hull's.

THE COURT:   I took it to mean that the Commonwealth was complaining, as they did earlier object, that you were trying to get in an alibi defense.

[COMMONWEALTH]:   We are.

[DEFENSE COUNSEL]:   It's not — it's a time.

[COMMONWEALTH]:   [Defense counsel], you have just alibied him out for the time of the homicide.

[DEFENSE COUNSEL]:   Absolutely not.

[COMMONWEALTH]:   Are you kidding me?  Are you kidding me?

THE COURT:   You are trying to get an alibi defense in through the back door without a notice.

[DEFENSE COUNSEL]:   We did not.  I'm asking — the question was did he go to Gerald Hull's house that evening.

THE COURT:   He should have just answered yes.

[DEFENSE COUNSEL]:   He answered what he answered.

THE COURT:   What he answered provided an alibi for certain times that are important as to –-

[DEFENSE COUNSEL]:   I understand what you are saying.  We will move ahead.

THE COURT:   And you didn't put on a notice

- 13 -

of an alibi.

[DEFENSE COUNSEL]: Absolutely right. Absolutely right.

THE COURT: Had you done so, you would have been permitted to present this testimony, but [the] Commonwealth would have had notice and they could have done interviews and investigations.

[COMMONWEALTH]: Just moving ahead is not good enough. The Commonwealth believes that a cautionary instruction should be given.

THE COURT: What cautionary instruction are you requesting?

[COMMONWEALTH]: [Appellant's] testimony should be stricken and not considered.

THE COURT: I'm not going to repeat that testimony because we have all heard it differently.

[DEFENSE COUNSEL]: If the [c]ourt feels it's sustainable, I have no problem with you sustaining the objection.

THE COURT: I sustained it. But they are going one step beyond that. They want a cautionary instruction.

[DEFENSE COUNSEL]: It can be stricken.

THE COURT: That's part of a cautionary instruction. [Appellant's] response or answer to the last question regarding his whereabouts on --

[DEFENSE COUNSEL]: At 4:30.

[COMMONWEALTH]: February 3rd into February 4th.

[DEFENSE COUNSEL]: I think the theory is [the homicide] happened at 9:00 or 9:30. This is hours, hours, hours and they can cross-examine on him.

THE COURT: I don't know what time he went to the strip joint, whatever you call these places.

[DEFENSE COUNSEL]: This answer is absolutely part of their theory in their case. It's seven, eight hours.

THE COURT: You haven't laid that foundation, [defense counsel].

[COMMONWEALTH]: Let's be 100 percent up front. Your client just said that the prior evening, which stands to reason that means sometime before midnight.

[DEFENSE COUNSEL]: No, it doesn't.

[COMMONWEALTH]: He was at this strip club and went to Denny's and then to Gerald Hull's house. If you knew that's where he was, then you were required to file a notice of alibi. This date was a date certain from the very moment you took this case. And furthermore, saying that we can cross-examine him on this is disingenuous because that then gets an alibi defense even more —

[DEFENSE COUNSEL]: I'm not trying to be disingenuous. I'm simply putting my response on the record. That's it. That's all I want to do. You make a ruling.

*Id.* at 1852-54. The Commonwealth objected to Appellant's testimony on the ground that Appellant failed to file Rule 567 notice of an alibi defense. In response to the Commonwealth's objection, defense counsel did not claim Appellant's testimony was admissible under the Rule 567(B)(1) exception regarding a defendant's personal alibi testimony. Instead, defense counsel asserted the testimony was not alibi evidence *per se* because it did not necessarily cover the time of the homicide. On appeal, Appellant changes course and attempts to characterize the testimony as alibi evidence to take

advantage of the Rule 567 exception. Appellant's failure at trial to raise the admissibility of his testimony under that exception, however, constitutes waiver of the issue on appeal. *See* Pa.R.A.P. 302(a) (stating issues not raised in trial court are waived and cannot be raised for first time on appeal); *Commonwealth v. York*, 465 A.2d 1028, 1032 (Pa.Super. 1983) (stating new and different theory of relief may not be successfully advanced for first time on appeal). Moreover, defense counsel at one point stated he had "no problem" with the court sustaining the objection and conceded the testimony could be stricken, which arguably provides an additional basis for waiver. Therefore, we decline to address Appellant's second issue on waiver grounds.

In his third issue, Appellant argues the court should have permitted him to cross-examine the Commonwealth's police witnesses regarding the names of individuals other than Codefendant whom Victim might have informed on in his capacity as a CI. Appellant asserts that line of questioning could have affected the jury's evaluation of the officers' credibility and exposed other people with a motive to kill Victim. Appellant concludes the court's grant of the Commonwealth's motion *in limine* restricting Appellant's cross-examination in this regard was improper and warrants a new trial. We disagree.

"Generally, a trial court's decision to grant or deny a motion *in limine* is subject to an evidentiary abuse of discretion standard of review."

- 16 -

*Commonwealth v. Reese*, 31 A.3d 708, 715 (Pa.Super. 2011) (*en banc*).

Evidence that someone other than the defendant might have committed the charged crime is admissible. *Commonwealth v. Rivers*, 537 Pa. 394, 405, 644 A.2d 710, 715 (1994). Nevertheless, "Merely suggesting that someone else may have had a motive is not evidence." *Id.* (holding trial court properly prevented defense counsel, during cross-examination of detective, from eliciting inference that another individual had been suspect in investigation, absent evidence to support that inference).

Instantly, the Commonwealth filed a pretrial motion *in limine* to prohibit Appellant from cross-examining law enforcement officers regarding the names of people other than Codefendant who might have been a target of Victim's work as a CI. The court granted the motion based on Appellant's lack of supporting evidence for his theory that Victim informed on other individuals who were aware of Victim's cooperation with police and had a motive to kill Victim. In other words, the proposed cross-examination would be just a fishing expedition. The court's order made clear that Appellant was permitted to present evidence that a specific someone else had committed the homicide. Therefore, the court properly exercised its discretion when it granted the Commonwealth's motion *in limine*. *See id.*; *Reese, supra*.

In his fourth issue, Appellant argues the PSP's eradication of Victim's CI file constituted a bad faith destruction of potentially useful defense evidence. Appellant contends the information in the file was central to the

Commonwealth's theory that Codefendant approached Appellant to carry out an execution of Victim because Victim had informed on Codefendant. Appellant asserts the file would have revealed whether Victim had provided information on other individuals involved in the drug trade. Appellant claims the PSP should have deviated from its record destruction protocol in light of the ongoing investigation into Victim's death. Appellant concludes the destruction of Victim's CI file violated Appellant's due process rights. We cannot agree.

"Under **Brady**[5] and subsequent decisional law, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." **Commonwealth v. Roney**, 622 Pa. 1, 22, 79 A.3d 595, 607 (2013). "To establish a **Brady** violation, an appellant must prove three elements: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued." **Id.** When the Commonwealth fails to preserve "potentially useful" evidence, as opposed to materially exculpatory evidence, no due process violation occurs unless the defendant can prove the Commonwealth acted in bad faith. **Commonwealth v. Chamberlain**, 612 Pa. 107, 30 A.3d 381 (2011).

_____

[5] **Brady v. Maryland**, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

"Potentially useful evidence is that of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 143, 30 A.3d at 402.

Instantly, Codefendant filed a pretrial motion to compel production of Victim's CI file. The court denied the motion as moot because the PSP had purged the file in 2009. There is no indication in the certified record that Appellant joined in Codefendant's motion. Further, that motion merely sought production of the CI file. Appellant was aware during trial that the police had maintained a file pertaining to Victim's work as a CI. Yet, Appellant fails to cite any part of the record where he raised a *Brady* or due process claim in connection with the PSP's destruction of the file. Therefore, Appellant waived his due process challenge on appeal. *See* Pa.R.A.P. 302(a).

Moreover, Appellant concedes the information in the file was "potentially useful" at best, which required a showing of bad faith on the part of the police. *See Chamberlain, supra*. In its initial Rule 1925(a) opinion, the trial court reasoned:

> Presuming that [Appellant] adopted [Codefendant's] Petition, [Appellant] still did not raise bad faith on the part of the Commonwealth. The [t]rial [c]ourt found by its December 27, 2011 Order that "the Commonwealth indicated that the [PSP], following standard state police practice regarding a person's confidential informant file, purged [Victim's] confidential informant file in 2009 (following a five (5) years requirement to maintain this type of file)[.]" As the PSP destroyed this file two years prior to the filing of charges in this case and pursuant to a

- 19 -

standard document retention policy, the [c]ourt cannot characterize the Commonwealth's failure to preserve the evidence as being done in bad faith.

(Trial Court Opinion, filed June 6, 2013, at 30). Consequently, even if Appellant had preserved the issue, we would accept the trial court's bad faith analysis and conclude Appellant's due process challenge merits no relief.

In his fifth issue, Appellant argues the Commonwealth failed to produce any physical evidence linking him to the murder. Appellant contends the Commonwealth relied on circumstantial evidence, including testimony from witnesses who were high on drugs or inside a loud club. Appellant asserts the Commonwealth failed to show any evidence of a conspiratorial agreement between Appellant and Codefendant outside of a single alleged meeting. Appellant concludes the verdict was against the weight of the evidence. We cannot agree.

Generally, an appellant must preserve a weight of the evidence challenge by filing a motion in the trial court:

**Rule 607.  Challenges to the Weight of the Evidence**

(A)   A claim that the verdict was against the weight of the evidence shall be raised with the trial judge in a motion for a new trial:

(1)   orally, on the record, at any time before sentencing;

(2)   by written motion at any time before sentencing; or

(3)   in a post-sentence motion.

Pa.R.Crim.P. 607(A).  "As noted in the comment to Rule 607, the purpose of

this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived." ***Commonwealth v. Gillard***, 850 A.2d 1273, 1277 (Pa.Super. 2004), *appeal denied*, 581 Pa. 672, 863 A.2d 1143 (2004).  A claim challenging the weight of the evidence cannot be raised for the first time in a Rule 1925(b) statement. ***Commonwealth v. Burkett***, 830 A.2d 1034 (Pa.Super. 2003).  An appellant's failure to avail himself of any of the prescribed methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim, even if the trial court responds to the claim in its Rule 1925(a) opinion. ***Id.***

Instantly, Appellant failed to raise his weight claim at sentencing or in a post-sentence motion.  Instead, Appellant raised his weight claim for the first time in his Rule 1925(b) statement in his initial appeal.  Therefore, Appellant waived his challenge to the weight of the evidence. ***See id.***

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable Gary M. Gilman and the Honorable Debbie O'Dell-Seneca, we conclude Appellant's remaining issues merit no relief.  The trial court opinions comprehensively discuss and properly dispose of those questions.  (***See*** Trial Court Opinion, filed September 2, 2015, at 10-13, 18-19; Trial Court Opinion, filed June 6, 2013, at 14-18, 20-23, 47-48 (incorporating in part Order of Court, filed November 2, 2011)) (finding: **(6)** attorney, who was not involved in case

and who knew juror, approached juror and asked whether he was serving on case; juror replied that he could not discuss it and walked away; attorney disclosed to Codefendant's counsel that juror was involved in county politics and had supported Washington County district attorney's campaign in 2011; all attorneys agreed juror's politics had no bearing on whether he should be removed; parties reached consensus that there were no grounds to remove juror; **(7)** Commonwealth witnesses' testimony established Codefendant set up meeting in Mr. Irwin's home, where Appellant agreed to kill Victim at Codefendant's request; while in jail, Appellant told fellow inmate of plan to kill Victim; evidence established Appellant willfully and deliberately shot and killed Victim; numerous witnesses testified that Appellant admitted killing Victim; when viewed in light most favorable to Commonwealth, evidence was sufficient to convict Appellant of first-degree murder and conspiracy; **(8)** prior to police interviews on September 24, 2003 and January 14, 2011, officers orally read **Miranda**[6] warnings to Appellant; in each instance, Appellant refused to sign written waiver form but orally agreed to waive his **Miranda** rights and speak to police; Appellant's oral waivers were sufficient; during second interview, police ceased all questioning immediately when Appellant requested attorney; Appellant voluntarily initiated subsequent conversation with police mostly on subjects unrelated to murder

_____

[6] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

investigation; court suppressed Appellant's response to officer's question during that conversation on whether Victim deserved to die; all of Appellant's other statements were admissible; **(9)** prosecution offered Michael Bowman immunity in exchange for his testimony at Appellant's trial; disclosure of immunity agreement to jury would have been favorable to Appellant; nevertheless, there is no indication Commonwealth suppressed or withheld evidence of agreement; existence of agreement was apparent on face of grand jury transcript; defense counsel received copy of grand jury transcript before trial and repeatedly referred to it during cross-examination of Mr. Bowman; therefore, Appellant had equal access to allegedly withheld information and no ***Brady*** violation occurred[7]; **(10)** Appellant and Codefendant were alleged to have participated in same series of acts or transactions constituting charged offenses; both were charged with conspiracy; evidence was not so complex as to render jury incapable of separating evidence as it applied solely to one defendant versus Appellant and Codefendant collectively; evidence and testimony was extensive but it

---

[7] To the extent Appellant complains he did not receive a copy of the immunity agreement itself, that document was duplicative of the evidence Appellant possessed regarding the existence of the agreement, *i.e.*, the grand jury transcript. ***See Commonwealth v. Lambert***, 584 Pa. 461, 474, 884 A.2d 848, 856 (2005) (holding no ***Brady*** violation occurred where Commonwealth did not disclose police activity sheet indicating witness had changed his story after he failed polygraph examination, because that information was reflected in other evidence turned over by Commonwealth during pretrial discovery).

all pointed toward Commonwealth's simple theory of case, *i.e.*, Codefendant had Appellant kill Victim in retaliation for Victim's cooperation with police as CI, which resulted in Codefendant's arrest; all evidence of solicitation was presented as to Codefendant; all evidence of shooting was presented as to Appellant; evidence of conspiracy was presented as to both Appellant and Codefendant; Appellant failed to establish he was prejudiced by consolidation of cases).  Therefore, we affirm Appellant's issues six through ten on the basis of the trial court opinions.  Based on the foregoing, Appellant is not entitled to relief on any of his issues on appeal.  Accordingly, we affirm.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/7/2016



IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF          )
PENNSYLVANIA,            )
                        )
                        )
                        )
    vs.                 )        CP-63-CR-0000357-2011
                        )        237 WDA 2015
MICHAEL DUNCAN,         )
                        )
    DEFENDANT/APPELLANT. )

Gary Gilman, J.
SEPTEMBER 1, 2015

## TRIAL OPINION PURSUANT TO Pa.R.A.P. 1925(a)

This Opinion serves as the trial court's Pa.R.A.P. 1925(a) Opinion on the Defendant's appeal regarding the trial court's Order of Sentence dated March 2, 2012 and filed March 5, 2012.[1] After a jury trial, Defendant was found guilty of Criminal Homicide, Murder in the First Degree, a felony of the first degree, 18 Pa.C.S.A. § 2501(a); and Criminal Conspiracy to Commit Homicide, Murder in the First Degree, a felony of the first degree, 18 Pa.C.S.A. § 903. (Reproduced Record ["R.R."] #4, 71). The trial court sentenced the Defendant as follows:

1. Criminal Homicide, Murder in the First Degree, to pay his *pro rata* share of restitution of $226.50 to the Pennsylvania State Police ("PSP") Harrisburg Laboratory; to complete all rehabilitative treatment recommended by the

---

[1] The trial was conducted by Judge Janet Moschetta Bell. Further, Judge Bell sentenced the Defendant. Judge Bell retired on January 4, 2013. Consequently, the case was reassigned to then President Judge, Debbie O'Dell Seneca. Judge O'Dell Seneca, the judge who authored the first 1925(a) opinion in this case, retired on January 4, 2015. Therefore, the case was reassigned to Judge Gary M. Gilman. Judge Gilman reinstated the Defendant's direct appeal rights. After the Defendant filed a concise statement of matters complaint, Judge Gilman authored the within opinion.



Pennsylvania Department of Corrections ("DOC"); and to be sentenced to a state prison for a mandatory period of life imprisonment. (R.R. 4).

2. Criminal Conspiracy to Commit the Crime of Homicide, Murder in the First Degree, to pay his *pro rata* share of restitution of $226.50 to the PSP Harrisburg Laboratory; to pay his *pro rata* share of restitution of $1,842.50 to the PSP Greensburg Regional Laboratory; to complete all rehabilitative treatment recommended by the DOC; and to be sentenced to a state prison for a minimum of fifteen (15) years to a maximum of thirty (30) years consecutive to Count One above. (R.R. 4).

The Defendant's aggregate sentence was life in prison plus a consecutive fifteen (15) to thirty (30) years. (R.R. 4). Initially, this court appointed Defendant's current counsel, Attorney Stephen Paul, to assist the Defendant with a Post-Conviction Relief Act ("PCRA") Petition. However, after this court re-instated Defendant's direct appeal rights *nunc pro tunc*, Attorney Paul filed a notice of appeal and drafted Defendant's Concise Statement of Matters Complained of on Appeal ("Concise Statement"). Of the twenty (20) issues raised in Defendant's current Concise Statement, fifteen (15) were raised in Defendant's prior Concise Statement and addressed by the trial court in the 2013 1925a Opinion. Thus, where appropriate and relevant, this court incorporates sections of the 2013 1925a Opinion with the current 1925a Opinion.

Factual Background

The facts of this case were comprehensively described in the 2013 1925a Opinion. That text and accompanying references and citations are incorporated herein immediately below:

John Lynn Newman ("Newman") was shot to death on February 3, 2003, in California, Pennsylvania. (Trial Transcript ["T.T."] 123.) On January 24, 2012, a jury found that Newman's death was the result of a conspiracy and solicitation between John Ira Bronson, Jr. ("Bronson"), the defendant herein, and his co-defendant at trial, Michael J. Duncan ("Duncan"). (Docket 67). Any complete

2

summary of the facts for the intervening nine years must begin with the circumstances that led to his conspiracy and solicitation.

In 2002, Newman was approached by the PSP and informed "that he had been investigated and [that] felony drug charges against him [were] pending." (T.T. 733). In October of that year, Trooper Aaron Borello ("Trooper Borello") approached Newman about becoming a confidential informant ("C.I.") for the PSP. (T.T. 733). Trooper Borello and Newman then set about performing a bust involving Newman's supplier, Bronson. (T.T. 736:22). After Bronson was observed selling 200 pills of Oxycodone to Newman, he was arrested. (T.T. 737:20). The PSP searched Bronson's home and found about $384,000 in cash which was seized.[2] (T.T. 748:15).

After his arrest, Bronson began acting as a C.I., first with the PSP and then for the Federal Bureau of Investigation ("F.B.I.") (T.T. 883:22-25). While working with the PSP, Bronson asked Trooper Borello directly if it was Newman who had informed on him. (T.T. 755-756). Unfortunately, Bronson's participation as a C.I. was fruitless and ended "within a week" prior to Newman's death. (T.T. 888: 25).

At some point after Bronson's arrest, Duncan spoke with his associate, Howard Irwin ("Irwin"), about another man, "[Michael] Bowman ("Bowman"), having some type of hookup where he [could] make some money . . . taking care of [an unarmed] snitch." (T.T. 1467: 21-22). Irwin then witnessed, at his home, a meeting between Duncan, Bronson, and Bowman, a drug dealer and associate of Bronson. (T.T. 1466: 7-14). During the meeting, Bronson asked Duncan to kill Newman and Duncan agreed. Bronson asked Bowman to cooperate in the killing, but Bowman declined. (T.T. 1031: 7-18).

Prior to Newman's death, Robert Bedner ("Bedner") called Brian Dzurco ("Dzurco"). (T.T. 1213). Phone records revealed that the call occurred on January 20, 2003, about two weeks before the death of the victim. (T.T. 1238: 22-23). Bedner put Bronson on the phone with Dzurco, who asked Dzurco to set up a meeting with Newman. (T.T. 1226). Dzurco agreed because he believed the matter to be related to a drug debt. After receiving information that the meeting might be fatal for Newman, Dzurco chose not to arrange it. (T.T. 1230, 1231).

Shawn Geletei ("Geletei") testified that, while in jail, Duncan approached him and bragged about his intention to murder Newman. He recalled that the conversation was prior to Newman's death. Geletei specifically testified:

> [Duncan] come over and asked if I knew Newman. I said, yeah. He says, I'm going to take his ass out. And he started saying something about Bronson and drugs and all this. I said, I'm only in here [in jail] for child support, I don't want to get involved in this. And he kept running his mouth saying about him being a monster and taking people out before and all this.

(T.T. 794: 4-12).

Through phone records and witness testimony, the following timeline of February 3, 2003, being the day of the killing, was revealed:

---

[2] Bronson eventually pled guilty to drug trafficking and was incarcerated. (T.T. 1777-1778).

3

At 7:32 p.m. a call was made from Newman's cell phone to Brian Horner ("Horner"), which lasted 3 minutes and 19 seconds. (T.T. 571: 5-12). Sometime before 8:00 p.m. Newman asked his wife for $300.00, ostensibly for cartons of cigarettes, but was, most likely to buy heroin. (T.T. 103: 7-12). At 7:56 p.m. a call was made from Newman's cell phone to Horner, which lasted 1 minute and 9 seconds. (T.T. 571: 17-23). Sometime after receiving the money, Newman left the house. (T.T. 74:11-25). He met Geletei in the alley between their houses to discuss acquiring Oxycodone. Geletei told Newman that he could not locate any Oxycodone. Newman told Geletei that he was going to meet Horner. (T.T. 786-787).

Upon returning home, Newman informed his wife that Horner needed a rise and he left again. (T.T. 45: 6-10). At 8:08 p.m. Newman called a drug client named Amelia Pajerski ("Pajerski"). (569: 24-25). At approximately 8:30 p.m. Newman sold Pajerski stamp bags of heroin. (T.T. 320-321). He told Pajerski that the heroin was from Horner. (T.T. 331: 4-5). Pajerski specifically recalled being home in time to watch a favorite show by 9:05 p.m. (T.T. 320-321). At approximately 9:00 p.m. Newman's daughter heard the distinctive sound of her father's car pass by their house. (T.T. 76-77). At 9:03 p.m. Newman called Geletei's landline, which lasted 6 seconds. Thereafter, Newman was killed by a bullet fired at close range while he was sitting in his car, which was parked down the street from his home. (T.T. 130-131).

Next, the record reveals the events of February 4, 2003, as follows: Early in the morning, Newman's daughter noticed his car parked down the street from their house. She observed her father inside the car, but the car door was locked. (T.T. 78: 4-12). Upon returning to the car with Mrs. Newman, they found the victim dead and contacted the authorities. (T.T. 104-105). The police searched the scene and located a spent bullet casing inside the car, (T.T. 143:10), and unfired cartridge outside the vehicle. (T.T. 175: 18). Newman had $115.00 in cash, (T.T. 185: 18-21), a marijuana "roach", (T.T. 1620:19), a cell phone, (T.T. 1620: 20), and ten packets of heroin. (T.T. 1620: 18). Around 12:00 p.m. Ryan Givens called Duncan to inform him that Newman had been killed, to which Duncan responded, "snitches get dealt with." (T.T. 1280: 10). The authorities took Horner in for questioning and tested his hands for gunshot residue. The results allowed the tester to state "that [Horner] could have fired a gun, could have come in contact with something that had gunshot primer residue on it," (T.T. 664: 12-14), or "that [Horner] was in very close proximity to a firearm when it was discharged." (T.T. 690: 8-10).

It took several years for charges to be filed in this "cold case". The relevant events of the years are summarized herein:

In March, 2003, Irwin asked Duncan to wire money to him while on vacation. (T.T. 1470: 5-10). The money, being $931.00, was transferred on March 10, 2003. (T.T. 1639: 17-21). Also in early March, Duncan appeared early one morning at the home of his drug associate, Gerald Hull ("Hull"). Hull's home was used to cook and store crack cocaine. Duncan opened a safe located within the Hull residence, to which only he and Irwin had access. At that time, Duncan was heard making a call. (T.T. 1353: 16-23). The exact nature of the call was unclear. However, Hull, who was admittedly high on crack at the time, recalled hearing Duncan speak about shooting someone. (T.T. 1355: 25; 1356: 3-4). Duncan, who appeared "giddy, nervous, [and] agitated," (T.T. 1353: 18), pointed a gun in Hull's face before leaving. (T.T. 1375: 17-18). When Irwin later returned from

4

vacation, he discovered that Duncan had "disappeared". (T.T. 1471: 18). Irwin found that the safe had been emptied. The safe's contents, being money, drugs and a nine millimeter (9mm) pistol, were missing, and only a cell phone was left behind. (T.T. 1472: 8-14; 1592: 19-20).

In April of 2003, while on furlough, Bowman spoke with Duncan, who told Bowman that he killed Newman, and explained the manner in which he did it. (T.T. 1032: 11-12). Duncan told Bowman that he was in the rear of Newman's car and shot him in the left ear. (T.T. 1032: 19-21). Between April and June of 2003, Bowman had a three-way call with a woman and Duncan. (T.T. 1105). Again, Duncan admitted that he killed Newman. (T.T. 1113: 5-8).[3]

In September of 2003, PSP Trooper James Monkelis ("Trooper Monkelis") and Trooper Beverly Ashton ("Trooper Ashton") interviewed Duncan. (T.T. 1639-1640). He denied having ever been in California, PA, and denied knowing Newman. (T.T. 1640: 16, 24). When told of Newman's death, Duncan said that he did not "whack" him, despite not being told the nature of Newman's death.[4] (T.T. 1641: 8). Duncan also identified Newman as a snitch. (T.T. 1641: 15). Newman's role as a C.I. had not been released to the public. (T.T. 1641: 16-25). Duncan made other inculpatory statements, such as:

1. Stating that "hypothetically" someone, implying Newman, owed someone else, implying Bronson, a lot of money. (T.T. 1641: 8-12).
2. Stating that he could not do the time and worrying that he would rather not be "45, 46, or 46, 47 at the clubs." (T.T. 1642: 15-16).
3. In response to the interviewer stating that it might have been self-defense, he stated "come on, man, you seen that crime scene, it couldn't have been self defense."[5]

In late 2003, a former corrections officer, Eric DeLong ("DeLong"), encountered Duncan in a bar. (T.T. 847: 16-20). DeLong overheard Duncan state, "yeah, I popped that guy in the back of the head [in] California." (T.T. 850: 9-12). A few days later, DeLong reported this incident to the PSP, who put him in touch with the FBI. (T.T. 851: 5-8). Despite this report, DeLong "didn't hear anything for, approximately, seven years." (T.T. 851: 7-8).

Approximately two and a half years after Irwin first discovered that Duncan had fled California, PA, he finally spoke to Duncan. When Irwin asked Duncan why he had left California, PA, Duncan gave his reasons, admitting to killing Newman and also to Horner's involvement. Duncan told Irwin that "Brian Horner was running [Duncan's] name about being involved in the homicide and [Horner] was actually the one that . . . brought [Newman] out [of] the house and . . . brought him to the car. And [Duncan] was in the car and [Duncan] whacked [Newman]." (T.T. 1472: 22-25; 1473: 3-4). Duncan went on to tell Irwin that he "whacked," or killed, Newman because he was a "snitch". (T.T. 1473: 11-13).

---

[3] The Court notes that the testimony regarding this call was elicited from Bowman on cross-examination. Defense counsel asked Bowman "you are saying . . . that [Duncan] made a three-way call in a recorded jail call where he goes, yeah, that's right, I killed that guy; is that what you are saying to the jury?" Bowman answered "That's exactly what I'm telling the jury." (T.T. 1078-1079).

[4] The Court notes that it was public knowledge that Newman had been killed.

[5] The Court notes that no crime scene photos had been released at the time of the interview. (T.T. 1643: 16-20).

5

In January 2011, Duncan was arrested in Amherst, Ohio. He was interviewed again by Trooper Monkelis (T.T. 1644: 4-7), and again made inculpatory statements. He stated that "snitches get dealt with." (T.T. 1645: 4). He stated that "he never owned or carried that caliber of a weapon."[6] (T.T. 1645: 5-6). After the interview, Duncan was transported back to Pennsylvania. Duncan, while en route, spoke in further detail about his views on snitches, saying that even "God doesn't like snitches." (T.T. 1646: 5-21).

In August of 2011, Bronson was housed in the Washington County Correctional Facility ("WCCF") in connection with being charged in this case. In December of 2011, Bronson admitted to Michael McCarthy, a fellow inmate, that he attended the 2002 meeting with Duncan and Bowman at Irwin's house. (T.T. 1428: 12-13). He admitted that the meeting concerned "offing", or killing, Newman. (T.T. 1429: 15-16). McCarthy then reported the conversation to the authorities. (T.T. 1429: 20-23).

Procedural History

The procedural history was set forth in the 2013 1925a Opinion. That text and accompanying references and citations are incorporated herein immediately below:

These charges were initiated with a Washington County Grand Jury presentment dated December 8, 2010, recommending that Michael J. Duncan, John Ira Bronson, Jr., and Howard Edward Irwin, Jr. be charged with specific crimes. The recommendation with respect to Michael J. Duncan was Count One; Criminal Homicide, 18 Pa.C.S.A. § 2502(a), First Degree Murder, and Count Two: Criminal Conspiracy, 18 Pa.C.S.A. § 903. (Docket 6). On January 13, 2011, by Order of this Court, the Commonwealth was granted leave to disclose the Presentment as an attachment to the affidavit of probable cause to an issuing authority and the presentment was ordered unsealed and filed with the Clerk of Courts of Washington County. (Docket 6). Charges were filed on January 13, 2011. Defendant Duncan's preliminary arraignment was held on January 14, 2011, and after a preliminary hearing on February 2, 2011, Defendant was held for court on both charges. (Docket 10). The case was assigned to now-retired Judge Janet Moschetta Bell and she conducted a formal arraignment on April 14, 2011. (Docket 11, 18). The Commonwealth filed its two-count Criminal Information on April 7, 2011. (Docket 12). On May 6, 2011, Attorney David S. Shrager filed a formal entry of appearance on behalf of defendant and entered a plea of not guilty on all charges on defendant's behalf. (Docket 14).

On July 8, 2012, defense counsel filed a *Motion to Produce Additional Discovery and for an Extension of Time to File Pre-Trial Motions.* (Docket 19). The Court granted that Motion by Order dated July 8, 2012. (Docket 19). The Commonwealth filed a Discovery Response on July 25, 2011. (Docket 20). On August 26, 2011, defense counsel filed a *Motion for Extension of Time to File Pre-Trial Motions* and that Motion was granted by Court Order. (Docket 21). On August 31, 2011, upon request of the Warden of the WCCF and for administrative

---

[6] The Court notes that the caliber of the weapon was never released. (T.T. 1645: 7-12).

and security reasons, the Court issued an Order permitting the transfer of defendant Duncan from the WCCF to the Fayette County Jail. (Duncan 22).

Defense counsel filed an *Omnibus Pretrial Motion- Motion to Compel the Grand Jury Transcript* and by Order dated September 22, 2011, this Court granted that Motion compelling the Commonwealth to turn over the Grand Jury Testimony. (Docket 23). The Commonwealth did so without objection. Also on September 22, 2011, defense counsel filed numerous Omnibus Pre-Trial Motions, Motions in Limine, and other miscellaneous motions **separately**: Motion to Transfer (Docket 24); Omnibus Pre-Trial Motion- Motion to Suppress (Docket 25); Omnibus Pre-Trial Motion – Motion to Suppress Extra-Judicial Statements (Docket 26); and seven (7) different Omnibus Pre-Trial Motions- Motions in Limine (Docket 27-33). The Court scheduled all of these Pre-Trial Motions for a hearing on October 27, 2011. The Commonwealth filed its responses to the numerous defense pre-trial motions listed above in Docket 37-48.

Meanwhile, the Commonwealth on September 30, 2011, filed a *Motion to consolidate* all three pending cases, *Commonwealth of Pennsylvania v. Michael J. Duncan*, 357-2011; *Commonwealth of Pennsylvania v. John Ira Bronson, Jr.*, 2217-2011; and, *Commonwealth of Pennsylvania v. Howard Edward Irwin, Jr.*, 358-2011 (Docket 35). The Commonwealth's Motion was scheduled for argument on October 21, 2011; all defense attorneys presented arguments against the consolidation while the Commonwealth argued in favor of its Motion. (Docket 34). The *Motion to Consolidate* all three cases was granted by Court Order dated October 25, 2011. (Docket 36).

After a hearing and arguments on October 27, 2011, addressing the numerous pending defense pre-trial motions, the Court issued a lengthy Order dated October 31, 2012, denying or granting the pending motions. (Docket 49). In Docket numbers 50 and 52, the Commonwealth filed Supplemental Discovery Responses. The Court filed an Order scheduling the consolidated cases of *Commonwealth v. Michael J. Duncan* and *Commonwealth v. John Ira Bronson, Jr.* for jury trial on January 9, 2012. (Docket 51). The third co-defendant, Howard Edward Irwin, Jr. pursuant to a plea agreement, pled guilty to one count of Hindering Apprehension or Prosecution – False Information to Law Enforcement, a felony of the third degree, 18 Pa.C.S.A. § 5105(a)(5), on December 14, 2011. Irwin testified in the Commonwealth's case-in-chief in the consolidated cases of *Commonwealth of Pennsylvania v. Michael J. Duncan* and *Commonwealth of Pennsylvania v. John Ira Bronson, Jr.*.

On December 2, 2011, Attorney Shrager filed three additional Omnibus Pre-Trial Motions- Motion in Limine (Docket 53-55) which the parties agreed did not require a scheduled hearing but would be considered at the appropriate time during trial. On December 8, 2011, the Court issued a *Case Management Order*. (Docket 56). The Commonwealth filed additional Supplemental Discovery Responses on December 12 and December 1, 2011. (Docket 57-58). On December 19, 2011, the Commonwealth filed its *Proposed Jury Questionnaire* and *Voir Dire*. (Docket 59). The Commonwealth also filed a *Motion in Limine #1* (Docket 60) which was heard by the Court on December 20, 2011. The Court issued an Order on December 27, 2011, granting the Commonwealth's *Motion in*

7

*Limine #1.* (Docket 62). The cases were scheduled for a final pre-trial conference on January 3, 2012. (Docket 61). On December 29, 2011, defense counsel filed his *Proposed Voir Dire Questions.* (Docket 63). The Commonwealth filed additional Supplemental Discovery Responses on January 5, 2012 (Docket 64), January 6, 2012 (Docket 65), and January 9, 2012 (Docket 66). On January 10, 2012, the Court issued an Order denying Attorney Shrager's oral motion to sanction the Commonwealth for the alleged late discovery of a Western Union document citing Pa.R.Crim.P. 573 (D) and (E) and the lack of showing of prejudice to the defendant. (Docket 67).

On January 12, 2012, defense counsel filed another *Omnibus Pre-Trial Motion- Motion to Suppress Statement* (Docket 68) for which the Court issued an Order dated January 12, 2012, after hearing arguments of counsel on January 10-11, 2012. In that Order, the Court denied defense counsel's request that the defendant's video and recorded statements of January 14, 2011, be suppressed citing pertinent case law and the Court's rationale. (Docket 69).

Jury selection began on January 9, 2012, and was completed on January 10, 2012. The jury trial commenced on January 11, 2012 and concluded on January 23, 2012. The jury was charged on January 24, 2012, and on the same date, found Michael J. Duncan guilty on both counts, Criminal Homicide- Murder in the First Degree and Criminal Conspiracy to Commit Criminal Homicide 0 Murder in the First Degree. (Docket 71).

On March 2, 2012, the Court sentenced the defendant to state prison for an aggregate sentence of life in prison plus a consecutive fifteen to thirty (15-30) years. (Docket 74). On March 22, 2012, Attorney Shrager filed a *Notice of Appeal to the Pennsylvania Superior Court.* (Docket 76). On April 2, 2012, the Court issued its 1925(b) Order requesting the filing of a Concise Statement of Matters Complained of on Appeal. (Docket 78). Upon request of defense counsel, the Court granted Attorney Shrager two continuances to file his Concise Statement. (Docket 80, 91). Upon receipt of and payment for the approximate 2,000 page trial transcript by defense counsel, the Court granted Attorney Shrager's *Motion to Withdraw* as counsel for Michael J. Duncan on August 22, 2012, and in the same order, appointed Attorney Jeffrey Watson to represent the defendant on appeal and to file defendant's 1925(b) statement. (Docket 93). With no objection from the Commonwealth, the Court granted Attorney Watson's *Motion for Extension of Time to File Concise Statement* filed September 10, 2011. (Docket 94). On October 9, 2012, Attorney Watson filed a twenty (20) page *Concise Statement of Matters Complained of on Appeal.* (Docket 95). This Court issued an Order on January 2, 2013, appointing Attorney Mary Bates to represent the defendant on appeal as Attorney Watson had accepted a position as an administrative law judge. (Docket 96). On January 4, 2013, the trial judge, the Honorable Judge Janet Moschetta Bell, retired after seven (7) years on the bench.

8

Consequently, President Judge O'Dell-Seneca authored a 1925a Opinion in response to the Defendant's Concise Statement. (R.R. #97). The Superior Court issued an opinion regarding Defendant's appeal on October 30, 2014. (R.R. #108). The Honorable T. Bender stated,

> Here, we ascertain that Appellant's disregard of both the spirit and explicit text of Rule 1925(b)(4) is too egregious to be overlooked, despite the trial court's valiant efforts at tackling Appellant's claims in its Rule 1925(a) opinion. Accordingly, we conclude that all of the claims raised in Appellant's Rule 1925(b) statement have been waived for his failure to comply with Rule 1925(b)(4), and we affirm his judgment of sentence on that basis.

After the Superior Court issued its Opinion concerning Defendant's direct appeal, Defendant filed a PCRA Petition with the trial court on December 3, 2014. (R.R. #105). The court appointed Attorney Stephen Paul to assist Defendant with his first PCRA Petition on December 3, 2014. (R.R. #106). Attorney Paul filed an Amended PCRA Petition on behalf of Defendant on January 30, 2015. (R.R. #112). On January 30, 2015, the court granted Defendant permission to file a direct appeal *nunc pro tunc*. (R.R. #112). Consequently, Attorney Paul filed a Notice of Appeal on February 6, 2015. (R.R. #113). The court granted Attorney Paul's *Motion for Extension of Time to File Concise Statement* on February 24, 2015 and *Motion for Extension of Time to File Concise Statement* on May 13, 2015. (R.R. #120). Defendant's Concise Statement of Matters Complained of on Appeal was filed July 13, 2015. (R.R. #121).

Legal Analysis

Defendant raises twenty (20) issues in the instant Concise Statement. Of the twenty arguments, fifteen (15) were raised in the prior Concise Statement and were addressed in the prior trial court's 1925a Opinion. The Superior Court stated in Footnote 5 of the Memorandum Opinion issued on October 30, 2014 in case 541 WDA 2012, "[n]evertheless, were we to reach the claims that Appellant raised in his brief to this Court, we would affirm based upon the trial

9

court's well-reasoned Rule 1925(a) opinion." Consequently, this court respectfully requests the Superior Court review the prior 1925(a) Opinion for a well-reasoned response to Defendant's repeated arguments. (R.R. #97).

In Paragraph 15 of the Concise Statement, Defendant claims that the Commonwealth committed prosecutorial misconduct and violated Defendant's due process rights under the U.S. and the Pennsylvania Constitutions when it did not disclose to the jury that witness Michael Bowman was offered immunity to prosecution in exchange for testimony during grand jury proceedings.

"Due process is offended when the prosecution withholds material evidence favorable to the accused." *Commonwealth v. Weiss*, 622 Pa. 663, 690-91, 81 A.3d 767, 783 (2013) (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194 (1963); *see also Commonwealth v. Weiss (Weiss II)*, 604 Pa. 573, 583-84, 986 A.2d 808, 814 (citing *Commonwealth v. Strong*, 563 Pa. 455, 761 A.2d 1167 (2000)). "The *Brady* rule encompasses impeachment evidence such as information as to any potential understanding between the prosecution and a witness, because such information is relevant to the witness's credibility." *Weiss*, 622 Pa. at 691, 81 A.3d at 783; *see United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (holding that impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule); *Commonwealth v. Spotz*, 616 Pa. 164, 47 A.3d 63, 84 (2012); *see also Strong*, 563 Pa. at 469, 761 A.2d at 1175 ("Impeachment evidence which goes to the credibility of a primary witness against the accused is critical evidence and it is material to the case [even when] that evidence is merely a promise or an understanding between the prosecution and the witness.").

To prove that a *Brady* violation has occurred, the Pennsylvania Supreme Court has explained that "an appellant must prove three elements: (1) the evidence at issue is favorable to

the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued." *Weiss*, 622 Pa. at 691, 81 A.3d at 783; *see also Spotz*, 616 Pa. at 200, 47 A.3d at 84. "Moreover, there is no *Brady* violation when the defense has equal access to the allegedly withheld evidence." *Weiss*, 622 Pa. at 691, 81 A.3d at 783; *see Commonwealth v. Spotz (Spotz II)*, 587 Pa. 1, 96, 896 A.2d 1191, 1248 (2006) (holding "[i]t is well established that no *Brady* violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence." (internal citation omitted)).

In the instant case, the Defendant alleges that the Commonwealth committed prosecutorial misconduct by not disclosing to the trial jury that it offered witness Michael Bowman immunity in exchange for testifying in a grand jury proceeding. Although there is no document concerning an offer of immunity in the reproduced record, the Commonwealth's immunity agreement to Mr. Bowman is memorialized in the transcript of the Grand Jury proceeding. At the grand jury proceeding, Judge Katherine Emery stated to Mr. Bowman that District Attorney Toprani had handed her a petition for a grant of immunity. (Grand Jury Transcript ["G.J.T."] pp. 125-26). Further, Mr. Bowman was asked "And do you also understand that we provided you with an order granting immunity, which the judge signed? Do you understand what that consists of?" Mr. Bowman answered "Yes." (G.J.T. p. 130). In addition, Mr. Bowman was asked, "Do you understand that the order of immunity will prevent the prosecution from any matters that you may testify before this Grand Jury." Mr. Bowman responded, "Yes." *Id.* Thus, it appears that the Defendant is correct that the prosecution offered Mr. Bowman immunity at some point prior to Defendant's trial.

11

In assessing whether the Commonwealth committed prosecutorial misconduct by not disclosing the existence of the immunity agreement to the jury, this court looks to the three elements of the *Brady* test. First, the court finds that the evidence at issue (here, the immunity agreement) is favorable to the Defendant. A jury may question Mr. Bowman's credibility or motives because he received an immunity agreement. As to the second element of the *Brady* test, however, the court finds no indication that the Commonwealth suppressed or withheld the evidence. Unlike in *Strong*, the existence of an agreement was apparent on the face of the grand jury transcript. In addition, Defendant's counsel possessed a copy of said transcript prior to the jury trial. It is clear that Defendant's counsel had a copy of the grand jury transcript because he frequently refers to the transcript during Defendant's jury trial. In fact, before beginning to cross examine Mr. Bowman during the jury trial, Defense Attorney Shrager stated the following: "Your honor, before we begin, I want to make sure the Court has a copy of the preliminary hearing transcript and for the Grand Jury. I think there is [sic] extra copies. So we can give it to Judge Moschetta Bell. I want to make sure you have a copy because I am going to be referring to it." (R.R. #86, p. 1066, LL. 9-14). Defense Attorney Shrager proceeded to refer to the grand jury transcript repeatedly during his cross-examination of Mr. Bowman. (*Id.* at pp. 1066-1103). For example, Attorney Shrager cross-examined Mr. Bowman regarding his testimony at the grand jury proceeding and what details, if any, he gave concerning the jail phone call (*Id.* at pp. 1075-77). Therefore, Defense Attorney Shrager had equal access to the immunity agreement between the Commonwealth and Mr. Bowman before trial commenced. Correspondingly, with respect to the third element of the *Brady* test, prejudice did not ensue because Defense Attorney Shrager had the opportunity to and did cross examine Mr. Bowman concerning his possible bias against the Defendant.[7] *See, e.g., id.* at pp. 1087, 1092-94.

---

[7] The issue of Mr. Bowman's potential bias in favor of the Commonwealth was addressed several times on the

12

For the above-mentioned reasons, there is no *Brady* violation present in the instant case — the Defendant had equal access to the allegedly deprived information. The Defendant's argument lacks merit.

In Paragraph 16 of the Concise Statement, Defendant alleges the trial court erred during the testimony of Mr. Bowman when it overruled Defendant's objection to questions related to a police interview report written by Corporal Beverly Ashton of the PSP, dated June 10, 2003. During re-direct examination, Assistant District Attorney Newberry (A.D.A. Newberry) asked Mr. Bowman, "[n]ow, with respect to Michael Duncan, during those two hearings, were you ever asked about a three-way phone call?" [8] (*Id.* at p. 1099, LL. 14-16.) Mr. Bowman responded "I was not." (*Id.* at p. 1099, L. 17). Then, A.D.A. Newberry stated, "Mr. Bowman, I'm going to hand you what I'm marking as Commonwealth's Exhibit 35, I believe." (*Id.* at p. 1099, LL. 18-19). Next, A.D.A. Newberry asked, "Mr. Bowman, can you identify the date on that document?" (*Id.* at p. 1099, LL. 24-25). At that point, Defense Attorney Shrager objected to A.D.A. Newberry's question. (*Id.* at p. 1100, LL.7-8).

During a side-bar conference regarding Defense Attorney Shrager's objection, A.D.A. Newberry explained that Commonwealth's Exhibit 35 is a report Corporal Ashton composed regarding a June 10, 2003 interview with Mr. Bowman. (*Id.* at p. 1100, LL. 11-19). In addition, A.D.A. Newberry stated, "Mr. Shrager, on cross, asked Mr. Bowman if he had testified in front of the Grand Jury about a three-way phone call indicating that this is new information, that he is

---

record during the jury trial with respect to a plea offer that Mr. Bowman received for a separate case. Both Defense Attorney Emerick (counsel for co-defendant John Bronson) and Defense Attorney Shrager cross-examined Mr. Bowman regarding that plea offer to attempt to establish some motive for Mr. Bowman's testimony. *See* R.R. #86, pp. 1056-62, 1087-94. The fact that both defense attorneys had the opportunity and did cross examine Mr. Bowman as to his potential bias further substantiates this court's conclusion that *Brady* was not violated in this case.

[8] The two hearings being referred to are the grand jury proceeding and the preliminary hearing.

13

making it up. Well, on June 10, 2003, he was interviewed and talks about a three-way phone call with this woman from the jail. That can certainly come in." (*Id.*).

Although Defense Attorney Shrager claimed "I didn't ask him about this report," A.D.A. Newberry replied, "You opened the door to this." (*Id.* at p. 1101, LL. 19-20). Defense Attorney Shrager asserted, "I'm making an objection and whatever you rule, I'm good with either way. Didn't ask about that report. Asked about the Grand Jury. This is now going into something afield. Didn't ask about this. I stayed away from this report. If this report was not brought up - - I didn't ask him about that report. That's why I didn't. Does it open it up? I think it's a reversible error. Whatever?" (*Id.* at p. 1102, LL. 6-14).

The trial court made the following ruling. "I think Mr. Shrager has made an objection and Mr. Newberry has responded and there was a question on cross by Mr. Shrager regarding this phone call to the girl, three-way phone call, and I'm going to permit some re-direct. Objection overruled." (*Id.* at p. 1102, LL. 19-23).

The law is clear that "the scope of redirect examination is largely within the discretion of the trial court." *Commonwealth v. Gonzalez*, 109 A.3d 711, 730 (Pa. Super. Ct. 2015) (citing *Commonwealth v. Dreibelbis*, 493 Pa. 466, 479, 426 A.2d 1111, 1118 (1981). "Moreover, when a party raises an issue on cross-examination, it will be no abuse of discretion for the court to permit re-direct on that issue in order to dispel any unfair inferences." *Dreibelbis*, 493 Pa. at 479, 426 A.2d at 1118 (citing *Commonwealth v. Lewis*, 472 Pa. 235, 372 A.2d 399 (1977)). Thus, it is not an abuse of discretion for a court to permit re-direct on an issue raised during cross-examination.

In the instant case, the portion of the witness examination under scrutiny occurred during A.D.A. Newberry's re-direct examination of a witness, Mr. Bowman. The issue A.D.A.

14

Newberry was addressing in Corporal Ashton's report, which was identified as Commonwealth's Exhibit 35, was in response to an issue Defense Attorney Shrager raised during cross-examination of Mr. Bowman. A.D.A. Newberry was correct that during Defense Attorney Shrager's cross-examination of Mr. Bowman, he questioned Mr. Bowman regarding the three-way phone call. Specifically, during cross-examination, Defense Attorney Shrager asked Mr. Bowman, "[y]ou never testified about making a jail phone call and this guy that you barely knew is supposed to have said, yeah, I did it, you never said a word about that in front of the Grand Jury?" (R.R. #86, p. 1075, LL. 9-12). Mr. Bowman told Attorney Shrager, "I wasn't questioned about it." (*Id.* at p. 1075, L. 13). Defense Attorney Shrager then asked "[y]ou never said a word about that at the preliminary hearing; did you?" (*Id.* at p. 1075, LL. 14-15). Mr. Bowman testified "No, the initial interview." (*Id.* at p. 1075, L. 16).

Defense Attorney Shrager raised this issue a second time during his cross-examination of Mr. Bowman. Specifically, Defense Attorney Shrager asked "[w]hat you're saying to the jury is this guy you hardly know, and we have the exact words, I hadn't known him long, you are saying now that he made a three-way call in a recorded jail call where he goes, yeah, that's right I killed that guy; is that what you are saying to the jury?" (*Id.* at p. 1076, LL. 23-25; p. 1077, LL. 3-5). Mr. Bowman answered, "[t]hat's exactly what I'm telling the jury." To which, Defense Attorney Shrager responded "[b]ut you didn't say that, not a word about a jail call and recorded jail call when you testified in front of the grand jury?" (*Id.* at p. 1077, LL. 7-9). Mr. Bowman replied, "I wasn't asked." (*Id.* at p. 1077, L. 10).

Also during Defense Attorney Shrager's cross-examination of Mr. Bowman, he asked Mr. Bowman about his meeting with Corporal Ashton. Defense Attorney Shrager asked "[d]id you ever talk to Corporal Ashton?" (*Id.* at p. 1078, L. 15). Mr. Bowman replied "[u]m, sometime

15

in the summertime. After I wrote the letter, she came to see me." (*Id.* at p. 1078, LL. 18-19). When Defense Attorney Shrager asked "[d]id you tell Corporal Ashton about the letter?," Mr. Bowman replied "Yes. She knew about the letter. I wrote it to Silbaugh." (*Id.* at p. 1078, LL. 20-23). Attorney Shrager then asked "Now, did she- - do you know if you mentioned that you told Corporal Ashton that you got $1,200 and three ounces of cocaine to set these guys up?" (*Id.* at p. 1078, LL. 24-25; p. 1079, L. 3). Mr. Bowman replied, "No, I didn't tell her that." (*Id.* at p. 1079, L. 4). Mr. Shrager then asked "But she knew about the letter?" (Id. at p. 1079, L. 5). Mr. Newberry then objected by stating, "Judge, I'm going to object at this point. I believe Mr. Shrager is referring to an interview that took place June 10, 2003. The letter is postmarked February 11, 2011. Clearly he couldn't talk about a letter that hadn't been written." (*Id.* at p. 1079, LL. 6-11). The Court sustained A.D.A. Newberry's objection. (*Id.* at p. 1079, L. 12).

Because Defense Attorney Shrager questioned Mr. Bowman concerning the three-way phone call during his cross-examination, it was proper for the court to permit A.D.A. Newberry to question Mr. Bowman about the three-way phone call on re-direct. Not only did Defense Attorney Shrager ask Mr. Bowman about the three-way phone call multiple times, but he also asked about Mr. Bowman's interview with Corporal Ashton. Therefore, Attorney Shrager clearly raised this issue during his cross-examination of Mr. Bowman. Consequently, the trial court did not abuse its discretion in permitting A.D.A. Newberry to question Mr. Bowman on re-direct examination regarding Mr. Bowman's phone call mentioned in Corporal Ashton's report. Thus, Defendant's argument lacks merit.

In Paragraph 17 of the Concise Statement, Defendant argues the Commonwealth committed prosecutorial misconduct during Defendant's cross-examination when it stated Trooper Monkelis never testified that he informed Defendant that the victim was a confidential

16

informant. Specifically, the relevant portion of A.D.A. Newberry's cross-examination of Defendant is as follows:

> Q. How did you know that John Newman was a confidential informant?
> A. When Mr. Monkelis said he was a silent partner.
> Q. Please explain that to me.
> A. What do you mean explain it, it's self explanatory. He said the man was a silent partner?
> Q. And that means?
> A. He was working with the police. He didn't use the word confidential informant.
> Q. Mr. Duncan, he never indicated to you that he was working with the police; isn't that correct?
> A. He indicated that he was a silent partner. I believe the trooper testified that he indicated Mr. Newman was a silent partner.
> Q. Actually, Mr. Duncan, he did not testify to that. You're testifying to that right now.
> (R.R. #90, p. 1873, LL. 20-25; p. 1874, LL. 3-13).

The standard for determining whether prosecutorial misconduct has warranted a mistrial is well established. The standard is as follows.

> To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial. The touchstone is the fairness of the trial, not the culpability of the prosecutor. . . Not every unwise, intemperate, or improper remark made by a prosecutor mandates the grant of a new trial[.] Reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant such that the jurors could not weigh the evidence and render a true verdict.

*Commonwealth v. Spotz*, 616 Pa. 164, 47 A.3d 63, 97-98 (2012) (internal citations and quotation marks omitted).

The Commonwealth did not commit prosecutorial misconduct during the cross-examination of Defendant. A.D.A. Newberry asked Trooper Monkelis, "[d]uring the 2011 interview, did you inform Mr. Duncan that Mr. Newman had been a confidential informant?" (R.R. #90, p. 1884, LL. 12-14). Trooper Monkelis answered, "No, I did not." (*Id.* at p. 1884, L. 15). Thus, the Commonwealth was correct when it told Defendant that Trooper Monkelis did not inform Defendant that the victim was a confidential informant. Further, Defendant actually testified that Trooper Monkelis never used the word confidential informant. Therefore, the

17

Commonwealth did not commit prosecutorial misconduct by stating that the Trooper never informed Defendant that the victim was a confidential informant. The Defendant's argument lacks merit.

In Paragraph 19 of the Concise Statement, Defendant claims the trial court erred by failing to dismiss Juror #3, when it was discovered he was approached by an attorney not affiliated with trial and questioned about his role as a juror. While this specific issue was not raised in the Defendant's Prior Concise Statement, the trial court addressed whether Juror #3 should be dismissed in the prior 1925(a) opinion. (R.R. #97.)

Due to the nature of this issue, this court believes it is helpful to review the relevant factual background. The facts surrounding this issue are best summarized from the 2013 1925(a) Opinion regarding Paragraph 21 of the Defendant's prior Concise Statement:

> An issue arose during trial on January 18, 2012, when Attorney Sean Logue reported to Attorney Keith Emerick, counsel for John Ira Bronson, Jr., who reported to Attorney David S. Shrager, counsel for Michael Duncan, that Juror #3 was involved in county conservative politics and had supported Eugene Vittone for District Attorney in 2011. This matter developed on the record at T.T. 976-983, at which time the trial court took the matter under advisement and moved on to another witness, Coroner Timothy Warco, whose testimony finished the morning session. Prior to returning to the courtroom after the lunch recess, the trial court met in chambers with counsel to review the facts and explain its ruling and ultimately met with Juror #3 in the presence of all counsel. The facts can best be summarized by including the statement prepared by the trial judge's law clerk, Amanda Kraft, Esq., upon the trial judge's request:
>
>> This morning, January 18, 2012, immediately following morning break, I was approached by Juror #3 regarding a concern which has arisen during break, heeding the Judge's instruction prior to break, as he was returning through the metal detectors after taking a cigarette break, he was approached by Attorney Sean Logue. He stated that he knew Sean Logue, and Mr. Logue approached him, asked whether he was a Juror, and then asked whether he was on the murder trial. The Juror stated to me, that he told Mr. Logue he could not talk about it, walked away with the other jurors and returned to the courtroom. Two other jurors, #4 and #8, were apparently standing near Juror #3 and may have overheard the conversation.

18

> Juror #3 was concerned about being approached, then was more concerned when Mr. Logue entered the courtroom and approached Mr. Emerick's counsel table. The Juror was afraid that Mr. Logue was also working on the case or was somehow involved in this case as a witness. He immediately mentioned a problem to Tim Relich (trial judge's court crier/law clerk) when he was first approached by Mr. Logue, then spoke to me once entering the room and seeing Mr. Logue with Mr. Emerick. I immediately brought Juror #3's concern to the Judge.

Both Attorneys Shrager and Emerick asked that Juror #3 be dismissed although all attorneys in chambers agreed that politics has no bearing on a juror's removal. Attorney Shrager stated that he had nothing to support the request for the removal of Juror #3. The Commonwealth opposed the defense request to remove Juror #3. The Court denied the motion but agreed to inform Juror #3 of the fact that all parties were aware of his concerns regarding Attorney Sean Logue, who was not involved in the case whatsoever as a lawyer or as a witness; that he had followed instructions completely and properly; and would remain as Juror #3. *See* T.T. 994-1004.

(R.R. #97.)

While the focus of the discussion in chambers between the trial judge and the attorneys was Juror #3's suitability as a juror due to his involvement in conservative politics, that discussion necessarily involved the issue of Juror #3 being approached by an attorney not affiliated with trial and questioned about his role as a juror. The trial judge, Attorney Shrager, and the Commonwealth were clearly aware that Juror #3 was approached by an attorney not affiliated with trial and questioned about his role as a juror when they met to discuss whether Juror #3 should be removed from the jury panel. After discussing the interaction between Attorney Logue and Juror #3 as well as Juror #3's political activity, the trial court, Commonwealth, and Attorney Shrager reached a consensus that there were no grounds to remove Juror #3. Thus, the trial court did not err when it denied the request of Defense Attorneys to remove Juror #3, because all parties were in agreement that Juror #3 remain on the jury panel. Consequently, Defendant's argument lacks merit.

19

Finally, in paragraph 20 of the Concise Statement, Defendant argues that the trial court erred during Defendant's testimony when it granted Commonwealth's objection to evidence presented regarding Defendant's location on the date of the homicide. The Defendant testified regarding his location on the night of the victim's death several times during his direct examination. Consequently, this court will review each time the trial court ruled on Commonwealth's objection to such testimony.

The first time Defense Attorney Shrager asked Defendant what he did the night the victim was murdered, the Defendant testified that he was at a strip club called the Filly Corral. (R.R. #90, p. 1843, LL. 3-6; p. 1844, LL. 24-25). The Commonwealth objected to the Defendant's testimony regarding his location on the night the victim was murdered because they were not given notice of Defendant using an alibi. (*Id.* at p. 1845, LL. 4-16). The trial court sustained the Commonwealth's objection and the Defendant could not testify any more about the issue without alibi notice. (*Id.* at p. 1846, LL. 4-16).

Defendant testified a second time about being present at the strip club called the Filly Corral around the time of the victim's death and then traveling to Denny's restaurant. (*Id.* at p. 1850, LL. 20-24). Again, the Commonwealth objected. (*Id.* at p. 1850, LL. 25; p. 1851, L. 3). The trial court again sustained the Commonwealth's objection because the Defendant did give a notice of an alibi and the Defendant was "trying to get an alibi defense in through the back door without a notice." (*Id.* at p. 1853, LL. 5, 9-22). The trial court further explained that had the Defendant put on a notice of alibi, the Defendant would be permitted to present testimony about his location around the time the victim was killed, and the Commonwealth would have had notice of this issue and an opportunity to investigate the issue. (*Id.* at p. 1854, L. 3-5). Consequently, the trial court struck the Defendant's testimony from the record and issued a

20

cautionary instruction to the jury that it was to disregard the Defendant's testimony during their deliberation. (*Id.* at p. 1856, LL. 20-25; p. 1857, LL. 3-7).

Pa.R.Crim.P. 567(A) states, "A Defendant who intends to offer the defense of alibi at trial shall file with the clerk of courts not later than the time required for filing the omnibus pretrial motion provided in Rule 579 a notice specifying an intention to offer an alibi defense, and shall serve a copy of the notice and a certificate of service on the attorney for the Commonwealth." Pa.R.Crim.P. 567(B)(1) states, "If the Defendant fails to file and serve the notice of alibi as required by this rule, the court may exclude entirely any evidence offered by the Defendant for the purpose of proving the defense, except testimony by the defendant, may grant a continuance to enable the Commonwealth to investigate such evidence, or may make such other order as the interests of justice require." Pa.R.Crim.P. 567 replaced Pa.R.Crim.P. 305, and Pa.R.Crim.P. 567(B)(1) mirrors Pa.R.Crim.P. 305(1)(d).[9]

Due to the limited case law applying Pa.R.Crim.P. 567(B)(1), this court relies on the guidance provided from Pennsylvania case law analyzing and applying Pa.R.Crim.P. 305(C)(1)(d). "Rule 305 clearly enables the trial court to take whatever action is within the interests of justice, when no notice is properly provided as to the alibi defense." *Commonwealth v. Poindexter*, 435 Pa. Super. 509, 530, 646 A.2d 1211, 1221 (1994). Further:

---

[9] Pa.R.Crim.P. 305 states in pertinent part:
C. Disclosure by the Defendant
(1) Mandatory: (a) Notice of Alibi Defense: A defendant who intends to offer the defense of alibi at trial shall, at the time required for filing the omnibus pretrial motion under Rule 306, file of record notice signed by the defendant or the attorney for the defendant, with proof of service upon the attorney for the Commonwealth, specifying intention to claim such defense. Such notice shall contain specific information as to the place or places where the defendant claims to have been at the time of the alleged offense and the names and addresses of witnesses whom the defendant intends to call in support of such claim.
(d) If the defendant fails to file and serve notice of alibi defense . . . the court at trial may exclude entirely any evidence offered by the defendant for the purpose of proving the defense, except testimony by the defendant, or may grant a continuance to enable the Commonwealth to investigate such evidence, or may make such other order as the interests of justice require.

21

> Rule 305 C(1)(d) gives a trial court three options when a defendant fails to file and serve notice of an alibi defense: (1) the court may exclude entirely any evidence offered by the defendant in the form of alibi witnesses other than defendant himself; (2) the court may grant a continuance for the purpose of further investigation by the Commonwealth; or (3) the court may make such other order as the interests of justice require.

*Commonwealth v. Fernandez*, 333 Pa. Super. 279, 289-90, 482 A.2d 567, 572 (1984).

Upon review of the record, the Defendant failed to provide notice of an alibi defense to the Commonwealth before he testified under direct examination by his attorney. The guilt phase of the jury trial commenced on January 11, 2012, and concluded on January 23, 2012. It was not until after the Commonwealth rested its case that the Defendant attempted to testify regarding an alibi defense. This trial court was unable to find any evidence that the Defendant informed the Commonwealth or the trial court of his intention to present an alibi defense until he began testifying to same under direct examination on January 23, 2012.

It is clear to this trial judge that a defendant has the right to testify about an alibi defense even though he or she has not filed any formal written notice with the clerk of courts. As aforementioned, Pa.R.Crim.P. 567(B)(1) provides, "If the Defendant fails to file and serve the notice of alibi as required by this rule, the court may exclude entirely any evidence offered by the Defendant for the purpose of proving the defense, **except testimony by the defendant....**" (Emphasis added). Further, Pa.R.Crim.P. 567(G) states, "A defendant may testify concerning an alibi notwithstanding that the defendant has not filed a notice...." Indeed, the appellate courts have noted that a defendant may testify about an alibi defense despite that fact that they did not file any written notice; failure to file such notice only precludes the testimony of other witness who may corroborate a defendant's testimony. *See Commonwealth v. Nelson*, 389 Pa. Super. 417, 424, 567 A.2d 673, 677 (1989).

22

Consequently, Defendant's argument that the trial court erred when it granted Commonwealth's objection to Defendant's testimony about an alibi has merit.

## Conclusion

Based on the foregoing, this Court finds that all of the Matters Complained of on Appeal lack merit save the matter complained of in paragraph #20.

BY THE COURT:

_____

Gary Gilman, Judge

23

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA,

vs.

CP-63-CR-0000357-2011
541 WDA 2012

MICHAEL J. DUNCAN,

Defendant/Appellant.

## 1925 OPINION

This case having been heard by Judge Janet Moschetta Bell who retired effective January 4, 2013, and a *Concise Statement of Matters Complained of on Appeal* having been filed on October 9, 2012, this Court authors the following 1925(a) opinion on the legal issues raised on appeal. (Docket 95). This Court is not in a position to opine on fact and credibility determinations. See *Armbruster v. Horowitz*, 572 Pa. 1, 813 A.2d 698 (2002); *Commonwealth v. Yogel*, 307 Pa.Super. 241, 243, 453 A.2d 15, 16 (Pa.Super.1982) (holding that "[w]here the issue involved is one purely of law, the fact that someone other than the hearing judge wrote the opinion would be of little significance"). *Id.* at 16.

Defendant filed an appeal to the Superior Court of Pennsylvania from the Court's *Order of Sentence* dated March 2, 2012 and filed March 5, 2012 in which, after a jury trial, defendant was found guilty of Criminal Homicide – Murder in the First Degree, a felony of the first degree, 18 Pa.C.S.A. § 2501(a); and, Criminal Conspiracy to Commit Homicide – Murder in the First Degree, a felony of the first degree, 18 Pa.C.S.A. § 903. (Docket 4, 71).

1



The trial court sentenced the defendant as follows:

1. Criminal Homicide, Murder in the First Degree, to pay his pro rata share of restitution of $226.50 to the Pennsylvania State Police (PSP) Harrisburg Laboratory; to complete all rehabilitative treatment recommended by the Pennsylvania Department of Corrections (DOC); and to be sentenced to a state prison for a mandatory period of life imprisonment. (Docket 4).

2. Criminal Conspiracy to Commit the Crime of Homicide, Murder in the First Degree, to pay his pro rata share of restitution of $226.50 to the PSP Harrisburg Laboratory; to pay his pro rata share of restitution of $1,842.50 to the PSP Greensburg Regional Laboratory; to complete all rehabilitative treatment recommended by the DOC; and to be sentenced to a state prison for a minimum of fifteen (15) years to a maximum of thirty (30) years consecutive to Count One above. (Docket 4).

The defendant's aggregate sentence was life in prison plus a consecutive fifteen to thirty (15-30) years. (Docket 4). Defendant filed a *Notice of Appeal* to the Pennsylvania Superior Court on March 22, 2012. (Docket 76). Eventually, on August 22, 2012, the Court granted Attorney David S. Shrager's *Motion to Withdraw as Counsel* and appointed conflicts counsel, Jeffrey A. Watson, Esq., to represent defendant Duncan on appeal. (Docket 93). Appellate counsel Watson was directed to file a Concise Statement of Issues on Appeal pursuant to Pa.R.A.P. 1925(b) in the same Order. (Docket 93). After the granting of a time extension, Attorney Watson filed his *Concise Statement of Matters Complained of on Appeal* on October 9, 2012, a twenty-page document containing fifty-seven (57) separate allegations of issues complained of on appeal.[1] (Docket 95).

Attorney Watson is no longer appellate counsel as he accepted an appointment as an administrative law judge; Attorney Mary Bates was appointed as defense appellate counsel as of

---

[1] Due to the excessive length of defendant's *Concise Statement*, the Court will not quote it verbatim or attach a copy of it to this Opinion, but rather, will reference it by Paragraph/Issue number. (Docket 95).

2

January 2, 2013. (Docket 96). Wherever possible, the Court in its response to the numerous allegations of matters complained of on appeal will reference specific paragraphs numbers from the 1925(b) statement and proceed in as logical and organized a manner as possible. Further, the Court will incorporate sections of its *1925 Opinion* in the case of the co-defendant, John Ira Bronson, Jr., filed at 560 WDA 2012, where relevant and appropriate as the first eleven (11) issues in defendant Duncan's 1925(b) statement are nearly identical to the eleven (11) issues which constitute the whole of defendant Bronson's 1925(b) statement.

**Factual Background**

John Lynn Newman ("Newman") was shot to death on February 3, 2003, in California, Pennsylvania. (Trial Transcript ["T.T."] 123). On January 24, 2012, a jury found that Newman's death was the result of a conspiracy and solicitation between John Ira Bronson, Jr. ("Bronson"), the defendant herein, and his co-defendant at trial, Michael J. Duncan ("Duncan"). (Docket 67). Any complete summary of the facts for the intervening nine years must begin with the circumstances that led to this conspiracy and solicitation.

In 2002, Newman was approached by the PSP and informed "that he had been investigated and [that] felony drug charges against him [were] pending." (T.T. 733). In October of that year, Trooper Aaron Borello ("Trooper Borello") approached Newman about becoming a confidential informant ("C.I.") for the PSP. (T.T. 733). Trooper Borello and Newman then set about performing a bust involving Newman's supplier, Bronson. (T.T. 736: 22). After Bronson was observed selling 200 pills of Oxycodone to Newman, he was arrested. (T.T. 737: 20). The PSP searched Bronson's home and found about $384,000 in cash which was seized.[2] (T.T. 748: 15).

---

[2] Bronson eventually pled guilty to drug trafficking and was incarcerated. (T.T. 1777 - 1778).

3

After his arrest, Bronson began acting as a C.I., first with the PSP and then for the Federal Bureau of Investigation ("F.B.I.") (T.T. 883: 22-25). While working with the PSP, Bronson asked Trooper Borello directly if it was Newman who had informed on him. (T.T. 755-756). Unfortunately, Bronson's participation as a C.I. was fruitless and ended "within a week" prior to Newman's death. (T.T. 888: 25).

At some point after Bronson's arrest, Duncan spoke with his associate, Howard Irwin ("Irwin"), about another man, "[Michael] Bowman ("Bowman"), having some type of hookup where he [could] make some money . . . taking care of [an unnamed] snitch." (T.T. 1467: 21-22). Irwin then witnessed, at his home, a meeting between Duncan, Bronson, and Bowman, a drug dealer and associate of Bronson. (T.T. 1466: 7-14). During the meeting, Bronson asked Duncan to kill Newman and Duncan agreed. Bronson asked Bowman to cooperate in the killing, but Bowman declined. (T.T. 1031: 7-18).

Prior to Newman's death, Robert Bedner ("Bedner") called Brian Dzurco ("Dzurco"). (T.T. 1213). Phone records revealed that the call occurred on January 20, 2003, about two weeks before the death of the victim. (T.T. 1238: 22-23). Bedner put Bronson on the phone with Dzurco, who asked Dzurco to set up a meeting with Newman. (T.T. 1226). Dzurco agreed because he believed the matter to be related to a drug debt. After receiving information that the meeting might be fatal for Newman, Dzurco chose not to arrange it. (T.T. 1230, 1231).

Shawn Geletei ("Geletei") testified that, while in jail, Duncan approached him and bragged about his intention to murder Newman. He recalled that the conversation was prior to Newman's death. Geletei specifically testified:

> [Duncan] come over and asked if I knew Newman. I said, yeah. He says, I'm
> going to take his ass out. And he started saying something about Bronson and
> drugs and all this. I said, I'm only in here [in jail] for child support, I don't want to
> get involved in this. And he kept on running his mouth saying about him being a
> monster and taking people out before and all this.

(T.T. 794:4-12).

4

Through phone records and witness testimony, the following timeline of February 3, 2003, being the day of the killing, was revealed:

At 7:32 p.m. a call was made from Newman's cell phone to Brian Horner ("Horner"), which lasted 3 minutes and 19 seconds. (T.T. 571: 5-12). Sometime before 8:00 p.m. Newman asked his wife for $300.00, ostensibly for cartons of cigarettes, but was, most likely, to buy heroin. (T.T. 103: 7-12). At 7:56 p.m. a call was made from Newman's cell phone to Horner, which lasted 1 minute and 9 seconds. (T.T. 571: 17-23). Sometime after receiving the money, Newman left the house. (T.T. 74: 11-25). He met Geletei in the alley between their houses to discuss acquiring Oxycodone. Geletei told Newman that he could not locate any Oxycodone. Newman told Geletei that he was going to meet Horner. (T.T. 786-787).

Upon returning home, Newman informed his wife that Horner needed a ride and he left again. (T.T. 75: 6-10). At 8:08 p.m. Newman called a drug client named Amelia Pajerski ("Pajerski"). (569: 24-25). At approximately 8:30 p.m. Newman sold Pajerski stamp bags of heroin. (T.T. 320-321). He told Pajerski that the heroin was from Horner. (T.T. 331: 4-5). Pajerski specifically recalled being home in time to watch a favorite show by 9:05 p.m. (T.T. 320-321). At approximately 9:00 p.m. Newman's daughter heard the distinctive sound of her father's car pass by their house. (T.T. 76-77). At 9:03 p.m. Newman called Geletei's landline, which lasted for 6 seconds. Thereafter, Newman was killed by a bullet fired at close range while he was sitting in his car, which was parked down the street from his home. (T.T. 130-131).

Next, the record reveals the events of February 4, 2003, as follows: Early in the morning, Newman's daughter noticed his car parked down the street from their house. She observed her father inside the car, but the car door was locked. (T.T. 78:4-12). Upon returning to the car with Mrs. Newman, they found the victim dead and contacted the authorities. (T.T. 104-105). The police searched the scene and located a spent bullet casing inside the car, (T.T. 143: 10), and an

5

unfired cartridge outside of the vehicle. (T.T. 175: 18). Newman had $115.00 in cash, (T.T. 185:18-21), a marijuana "roach", (T.T. 1620:19), a cell phone, (T.T. 1620:20), and ten packets of heroin. (T.T. 1620:18). Around 12:00 p.m. Ryan Givens called Duncan to inform him that Newman had been killed, to which Duncan responded, "snitches get dealt with." (T.T. 1280: 10). The authorities took Horner in for questioning and tested his hands for gunshot residue. The results allowed the tester to state "that [Horner] could have fired a gun, could have come in contact with something that had gunshot primer residue on it," (T.T. 664: 12-14), or "that [Horner] was in very close proximity to a firearm when it was discharged." (T.T. 690: 8-10).

It took several years for charges to be filed in this "cold case". The relevant events of the years are summarized herein:

In March, 2003, Irwin asked Duncan to wire money to him while on vacation. (T.T. 1471: 5-10). The money, being $931.00, was transferred on March 10, 2003. (T.T. 1639: 17-21). Also in early March, Duncan appeared early one morning at the home of his drug associate, Gerald Hull ("Hull"). Hull's home was used to cook and store crack cocaine. Duncan opened a safe located within the Hull residence, to which only he and Irwin had access. At that time, Duncan was heard making a call. (T.T. 1353: 16-23). The exact nature of the call was unclear. However, Hull, who was admittedly high on crack at the time, recalled hearing Duncan speak about shooting someone. (T.T. 1355: 25; 1356: 3-4). Duncan, who appeared "giddy, nervous, [and] agitated," (T.T. 1353: 18), pointed a gun in Hull's face before leaving. (T.T. 1375: 17-18).

When Irwin later returned from vacation, he discovered that Duncan had "disappeared". (T.T. 1471: 18). Irwin found that the safe had been emptied. The safe's contents, being money, drugs and a nine millimeter (9 mm) pistol, were missing, and only a cell phone was left behind. (T.T. 1472: 8-14; 1592: 19-20).

6

In April of 2003, while on furlough, Bowman spoke with Duncan, who told Bowman that he killed Newman, and explained the manner in which he did it. (T.T. 1032: 11-12). Duncan told Bowman that he was in the rear of Newman's car and shot him in the left ear. (T.T. 1032: 19-21). Between April and June of 2003, Bowman had a three-way call with a woman and Duncan. (T.T. 1105). Again, Duncan admitted that he killed Newman. (T.T. 1113:5-8).[3]

In September of 2003, PSP Trooper James Monkelis ("Trooper Monkelis") and Trooper Beverly Ashton ("Trooper Ashton") interviewed Duncan. (T.T. 1639-1640). He denied having ever been in California, PA, and denied knowing Newman. (T.T. 1640: 16, 24). When told of Newman's death, Duncan said that he did not "whack" him, despite not being told the nature of Newman's death.[4] (T.T. 1641: 8). Duncan also identified Newman as a snitch. (T.T. 1641: 15). Newman's role as a C.I. had not been released to the public. (T.T. 1641: 16-25). Duncan made other inculpatory statements, such as:

1. Stating that "hypothetically" someone, implying Newman, owed someone else, implying Bronson, a lot of money. (T.T. 1641: 8-12).

2. Stating that he could not do the time and worrying that he would rather not be "45, 46 or 46, 47 at the clubs." (T.T. 1642: 15-16).

3. In response to the interviewer stating that it might have been self-defense, he stated "come on, man, you seen that crime scene, it couldn't have been self defense."[5] (1643: 14-15).

In late 2003, a former corrections officer, Eric DeLong ("DeLong"), encountered Duncan in a bar. (T.T. 847: 16-20). DeLong overheard Duncan state, "yeah, I popped that guy in the

---

[3] The Court notes that the testimony regarding this call was elicited from Bowman on cross-examination. Defense counsel asked Bowman "you are saying . . . .that [Duncan] made a three-way call in a recorded jail call where he goes, yeah, that's right, I killed that guy; is that what you are saying to the jury?" Bowman answered "That's exactly what I'm telling the jury." (T.T. 1078-1079).
[4] The Court notes that it was public knowledge that Newman had been killed.
[5] The Court notes that no crime scene photos had been released at the time of the interview. (T.T. 1643: 16-20).

7

back of the head [in] California." (T.T. 850: 9-12). A few days later, DeLong reported this incident to the PSP, who put him in touch with the FBI. (T.T. 851: 5-8). Despite this report, DeLong "didn't hear anything for, approximately, seven years." (T.T. 851: 7-8).

Approximately two and a half years after Irwin first discovered that Duncan had fled California, PA, he finally spoke to Duncan. When Irwin asked Duncan why he had left California, PA, Duncan gave his reasons, admitting to killing Newman and also to Horner's involvement. Duncan told Irwin that "Brian Horner was running [Duncan's] name about being involved in the homicide and [Horner] was actually the one that . . . brought [Newman] out [of] the house and . . . brought him to the car. And [Duncan] was in the car and [Duncan] whacked [Newman]." (T.T. 1472: 22-25; 1473: 3-4). Duncan went on to tell Irwin that he "whacked," or killed, Newman because he was a "snitch". (T.T. 1473: 11-13).

In January 2011, Duncan was arrested in Amherst, Ohio. He was interviewed again by Trooper Monkelis (T.T. 1644: 4-7), and again made inculpatory statements. He stated that "snitches get dealt with." (T.T. 1645: 4). He stated that "he never owned or carried that caliber of a weapon."[6] (T.T. 1645: 5-6). After the interview, Duncan was transported back to Pennsylvania. Duncan, while en route, spoke in further detail about his views on snitches, saying that even "God doesn't like snitches." (T.T. 1646: 5-21).

In August of 2011, Bronson was housed in the Washington County Correctional Facility ("WCCF") in connection with being charged in this case. In December of 2011, Bronson admitted to Michael McCarthy, a fellow inmate, that he attended the 2002 meeting with Duncan and Bowman at Irwin's house. (T.T. 1428: 12-13). He admitted that the meeting concerned "offing", or killing, Newman. (T.T. 1429: 15-16). McCarthy then reported the conversation to the authorities. (T.T. 1429: 20-23).

---

[6] The Court notes that the caliber of the weapon was never released. (T.T. 1645: 7-12).

8

## Procedural History

These charges were initiated with a Washington County Grand Jury Presentment dated December 8, 2010, recommending that Michael J. Duncan, John Ira Bronson, Jr., and Howard Edward Irwin, Jr. be charged with specific crimes. The recommendation with respect to Michael J. Duncan was Count One: Criminal Homicide, 18 Pa.C.S.A. § 2502(a), First Degree Murder, and Count Two: Criminal Conspiracy, 18 Pa.C.S.A. § 903. (Docket 6). On January 13, 2011, by Order of this Court, the Commonwealth was granted leave to disclose the Presentment as an attachment to the affidavit of probable cause to an issuing authority and the Presentment was ordered unsealed and filed with the Clerk of Courts of Washington County. (Docket 6). Charges were filed on January 13, 2011. Defendant Duncan's preliminary arraignment was held on January 14, 2011, and after a preliminary hearing on February 2, 2011, defendant was held for court on both charges. (Docket 10). The case was assigned to now-retired Judge Janet Moschetta Bell and she conducted a formal arraignment on April 14, 2011. (Docket 11, 18). The Commonwealth filed its two-count Criminal Information on April 7, 2011. (Docket 12). On May 6, 2011, Attorney David S. Shrager filed a formal entry of appearance on behalf of defendant and entered a plea of not guilty on all charges on defendant's behalf. (Docket 14).

On July 8, 2012, defense counsel filed a *Motion to Produce Additional Discovery and for an Extension of Time to File Pre-Trial Motions*. (Docket 19). The Court granted that Motion by Order dated July 8, 2012. (Docket 19). The Commonwealth filed a Discovery Response on July 25, 2011. (Docket 20). On August 26, 2011, defense counsel filed a *Motion for Extension of Time to File Pre-Trial Motions* and that Motion was granted by Court Order. (Docket 21). On August 31, 2011, upon request of the Warden of the WCCF and for administrative and security reasons, the Court issued an Order permitting the transfer of defendant Duncan from the WCCF to the Fayette County Jail. (Docket 22).

9

Defense counsel filed an *Omnibus Pretrial Motion – Motion to Compel the Grand Jury Transcript* and by Order dated September 22, 2011, this Court granted that Motion compelling the Commonwealth to turn over the Grand Jury Testimony. (Docket 23). The Commonwealth did so without objection. Also on September 22, 2011, defense counsel filed numerous Omnibus Pre-Trial Motions, Motions in Limine, and other miscellaneous motions **separately**: Motion to Transfer (Docket 24); Omnibus Pre-Trial Motion – Motion to Suppress (Docket 25); Omnibus Pre-Trial Motion – Motion to Suppress Extra-Judicial Statements (Docket 26); and seven (7) different Omnibus Pre-Trial Motions – Motions in Limine (Docket 27-33). The Court scheduled all of these Pre-Trial Motions for a hearing on October 27, 2011. The Commonwealth filed its responses to the numerous defense pre-trial motions listed above in Docket 37-48.

Meanwhile, the Commonwealth on September 30, 2011, filed a *Motion to Consolidate* all three pending cases, *Commonwealth of Pennsylvania v. Michael J. Duncan*, 357-2011; *Commonwealth of Pennsylvania v. John Ira Bronson, Jr.*, 2217-2011; and, *Commonwealth of Pennsylvania v. Howard Edward Irwin, Jr.*, 358-2011. (Docket 35). The Commonwealth's Motion was scheduled for argument on October 21, 2011; all defense attorneys presented arguments against the consolidation while the Commonwealth argued in favor of its Motion. (Docket 34). The *Motion to Consolidate* all three cases was granted by Court Order dated October 25, 2011. (Docket 36).

After a hearing and arguments on October 27, 2011, addressing the numerous pending defense pre-trial motions, the Court issued a lengthy Order dated October 31, 2012, denying or granting the pending motions. (Docket 49). In Docket numbers 50 and 52, the Commonwealth filed Supplemental Discovery Responses. The Court filed an Order scheduling the consolidated cases of *Commonwealth v. Michael J. Duncan* and *Commonwealth v. John Ira Bronson, Jr.* for jury trial on January 9, 2012. (Docket 51). The third co-defendant, Howard Edward Irwin, Jr.,

10

pursuant to a plea agreement, pled guilty to one count of Hindering Apprehension or Prosecution – False Information to Law Enforcement, a felony of the third degree, 18 Pa.C.S.A. § 5105(a)(5), on December 14, 2011. Irwin testified in the Commonwealth's case-in-chief in the consolidated cases of *Commonwealth of Pennsylvania v. Michael J. Duncan* and *Commonwealth of Pennsylvania v. John Ira Bronson, Jr.*

On December 2, 2011, Attorney Shrager filed three additional Omnibus Pre-trial Motions – Motion in Limine (Docket 53-55) which the parties agreed did not require a scheduled hearing but would be considered at the appropriate time during trial. On December 8, 2011, the Court issued a *Case Management Order*. (Docket 56). The Commonwealth filed additional Supplemental Discovery Responses on December 12 and December 15, 2011. (Docket 57-58). On December 19, 2011, the Commonwealth filed its *Proposed Jury Questionnaire and Voir Dire*. (Docket 59). The Commonwealth also filed a *Motion in Limine # 1* (Docket 60) which was heard by the Court on December 20, 2011. The Court issued an Order on December 27, 2011, granting the Commonwealth's *Motion in Limine # 1*. (Docket 62). The cases were scheduled for a final pre-trial conference on January 3, 2012. (Docket 61). On December 29, 2011, defense counsel filed his *Proposed Voir Dire Questions*. (Docket 63). The Commonwealth filed additional Supplemental Discovery Responses on January 5, 2012 (Docket 64), January 6, 2012 (Docket 65), and January 9, 2012 (Docket 66). On January 10, 2012, the Court issued an Order denying Attorney Shrager's oral motion to sanction the Commonwealth for the alleged late discovery of a Western Union document citing Pa.R.Crim.P. 573(D) and (E) and the lack of a showing of prejudice to the defendant. (Docket 67).

On January 12, 2012, defense counsel filed another *Omnibus Pre-Trial Motion – Motion to Suppress Statement* (Docket 68) for which the Court issued an Order dated January 12, 2012, after hearing arguments of counsel on January 10-11, 2012. In that Order, the Court denied

11

defense counsel's request that the defendant's video and recorded statements of January 14, 2011, be suppressed citing pertinent case law and the Court's rationale. (Docket 69).

Jury selection began on January 9, 2012, and was completed on January 10, 2012. The jury trial commenced on January 11, 2012, and concluded on January 23, 2012. The jury was charged on January 24, 2012, and on the same date, found Michael J. Duncan guilty on both counts, Criminal Homicide – Murder in the First Degree and Criminal Conspiracy to Commit Criminal Homicide – Murder in the First Degree. (Docket 71).

On March 2, 2012, the Court sentenced the defendant to state prison for an aggregate sentence of life in prison plus a consecutive fifteen to thirty (15-30) years. (Docket 74). On March 22, 2012, Attorney Shrager filed a *Notice of Appeal to the Pennsylvania Superior Court.* (Docket 76). On April 2, 2012, the Court issued its 1925(b) Order requesting the filing of a Concise Statement of Matters Complained of on Appeal. (Docket 78). Upon request of defense counsel, the Court granted Attorney Shrager two continuances to file his Concise Statement. (Docket 80, 91). Upon receipt of and payment for the approximate 2,000 page trial transcript by defense counsel, the Court granted Attorney Shrager's *Motion to Withdraw* as counsel for Michael J. Duncan on August 22, 2012, and in the same order, appointed Attorney Jeffrey Watson to represent the defendant on appeal and to file defendant's 1925(b) statement. (Docket 93). With no objection from the Commonwealth, the Court granted Attorney Watson's *Motion for Extension of Time to File Concise Statement* filed September 10, 2011. (Docket 94). On October 9, 2012, Attorney Watson filed a twenty (20) page *Concise Statement of Matters Complained of on Appeal.* (Docket 95). This Court issued an Order on January 2, 2013, appointing Attorney Mary Bates to represent the defendant on appeal as Attorney Watson had accepted a position as an administrative law judge. (Docket 96). On January 4, 2013, the trial judge, the Honorable Judge Janet Moschetta Bell, retired after seven (7) years on the bench.

12

## Legal Analysis[7]

<u>Paragraphs 1-4, 11 (Weight and Sufficiency of the Evidence)</u>

In the instant case, defendant was convicted of Criminal Homicide - Murder of the First Degree, 18 Pa.C.S.A. § 2501(a), 2502(a), and Criminal Conspiracy to Commit Murder of the First Degree, 18 Pa.C.S.A. § 903(c). He claims that the evidence presented at trial by the Commonwealth was not sufficient to prove the defendant's guilt beyond a reasonable doubt on the charges of Homicide and Conspiracy. He also claims that the evidence presented was insufficient to establish the required specific intent. (Docket 95).

Defendant challenges the verdict as being against the weight of the evidence. In so doing, he "concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Whiteman*, 485 A.2d 459 (Pa. 1984). In ruling on a motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, a trial court need not view the evidence in a light most favorable to the verdict winner. *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000). The determination of whether the verdict is in fact against the weight of the evidence is left to the discretion of the trial court. *Id.* In making its determination, the trial court may evaluate the credibility of witnesses and evidence. *Commonwealth v. Vogel*, 461 A.2d 604, 609 (Pa. 1983). The jury, through their verdict, decided on the credibility of the witnesses and evidence at trial. They found that the weight of the evidence supported a conviction herein. This Court is unable to supplement the record with further explanation of the jury's credibility determinations. See *Armbruster*, 813 A.2d 698; *Yogel*, 453 A.2d at 16.

---

[7] Attorney Jeffrey Watson filed a *Concise Statement of Matters Complained of on Appeal* in the instant case on October 9, 2012. The document was twenty-one (21) pages long, nineteen (19) of which contained a list of fifty-seven (57) separate issues raised on appeal. The trial court strongly considered applying the doctrine of waiver based on the number and vagueness of issues presented in the document, but decided to address the non-redundant, non-frivolous issues to the best of its ability in consideration of Pa.R.A.P. 1925(b)(4)(ii), (iv).

Defendant alleges issues pertaining to weight and sufficiency of the evidence through Paragraphs 1, 2, 3, 4, and 11 of his *Concise Statement of Matters Complained of on Appeal*, (Docket 95), being the Commonwealth introduced insufficient evidence to prove those charges upon which the defendant was convicted beyond a reasonable doubt (Paragraph 1); the Commonwealth introduced insufficient evidence to establish a premeditated killing beyond a reasonable doubt (Paragraph 2); the Commonwealth failed to establish that the defendant was involved in a conspiracy to commit First Degree Murder (Paragraph 3); the Commonwealth failed to establish that the defendant was involved in a conspiracy to commit criminal homicide (Paragraph 4); and, generally that the weight and sufficiency of the evidence was insufficient to sustain a conviction against the defendant (Paragraph 11).

In the case *sub judice*, defendant was convicted of Criminal Homicide, Murder in the First Degree, 18 Pa.C.S.A. § 2502(a), and Criminal Conspiracy to Commit Murder, 18 Pa.C.S.A. § 903. The Supreme Court of Pennsylvania summarized the applicable standard when considering the sufficiency of the evidence in a case of Murder and Conspiracy to Commit Murder:

> Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense beyond a reasonable doubt. In the case of first-degree murder, a person is guilty when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. An intentional killing is a killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing. The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body.
>
> . . .

14

To prove conspiracy, the trier of fact must find that: 1) the defendant intended to commit or aid in the commission of the criminal act; 2) the defendant entered into an agreement with another to engage in the crime; and 3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators. In the case of a conspiracy to commit homicide, each member of the conspiracy can be convicted of first-degree murder regardless of who inflicted the fatal wound.

*Commonwealth v. Johnson*, 985 A.2d 915, 920 (Pa. 2009) (quotations and citations omitted).

As to the level of premeditation necessary for first-degree murder, the Court has stated that it "may be very brief." *Commonwealth v. Mason*, 741 A.2d 708, 713 (Pa. 1999); *citing Commonwealth v. Green*, 426 A.2d 614 (Pa. 1981). Indeed, the "design to kill can be formulated in a fraction of a second," and presence of premeditation and deliberation will exist "whenever there is a conscious purpose to bring about death." *Id.*

It is well-established that the jury as fact-finder bears the responsibility of assessing the credibility of the witnesses and weighing the evidence presented, and in doing so, the trier of fact is free to believe all, part, or none of the evidence. *Commonwealth v. Pruitt*, 951 A.2d 307, 313 (Pa. 2008).

In *Commonwealth v. Kane*, 10 A.3d 327, 332 (Pa.Super. 2011), the Superior Court of Pennsylvania held that "any doubts concerning a defendant's guilt were to be resolved by the fact-finder unless the evidence was so weak and inconclusive that no probability of fact could be drawn from that evidence." Further, when reviewing a case for sufficiency of the evidence, the Court may not substitute its judgment for that of the fact-finder, such that "if the record contains support for the convictions, they may not be disturbed." *Commonwealth v. Ostrosky*, 866 A.2d 423, 427 (Pa.Super. 2005).

15

Ultimately, when reviewing a case on a sufficiency of the evidence claim, "a new trial can only be granted ... in the extraordinary situation where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Commonwealth v. Drumheller*, 808 A.2d 893, 908 (Pa. 2002); *citing Commonwealth v. Simpson*, 754 A.2d 1264, 1270 (Pa. 2000). In the instant case, the jury's verdict did not shock the conscience of the Court.

The defendant was found guilty of conspiracy. In order to do so, "the trier of fact must find that the defendant intended to commit or aid in the commission of the criminal act; the defendant entered into an agreement with another to engage in the crime; and, the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Johnson, supra* at 920. Thus, "each member of a conspiracy to commit homicide can be convicted of first-degree murder regardless of who inflicted the fatal wound." *Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008).

Herein, Duncan intended to aid in the commission of the crime of murder. Bronson asked Dzurco to set up a meeting with the victim. (T.T. 1226). Dzurco agreed but later changed his mind upon learning that Bronson's intention was to kill Newman. (T.T. 1230, 1231). In addition to Dzurco, Bronson also asked Bedner to assist, but he also declined. (T.T. 1031: 7-18).

Bronson eventually entered into an agreement with Duncan to kill Newman and Duncan agreed. This occurred in Irwin's home. (T.T. 1031: 7-18). Bowman, who attended the meeting, testified as to its purpose. (T.T. 1031: 7-18). Bronson admitted to Michael McCarthy that he attended the fateful meeting. (T.T. 1428: 12-13). He also admitted that the meeting concerned killing Newman. (T.T. 1429: 15-16). Further, Duncan made inculpatory statements as detailed above (T.T. 1641: 8-12) regarding the $300,000 which Newman had cost Bronson. Geletei testified to the following:

16

[Duncan] come over and asked if I knew Newman. I said, yeah. He says, I'm going to take his ass out. And he started saying something about Bronson and drugs and all this. I said, I'm only in here [in jail] for child support; I don't want to get involved in this. And he kept on running his mouth saying about him being a monster and taking people out before and all this.

(T.T. 794: 4-12). Duncan and Bronson committed acts in furtherance of the crime of homicide. Not only did Duncan make an agreement with Bronson to kill the victim, he actually pulled the trigger and solidified the commission of the crime.

When viewing the facts in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense of Criminal Conspiracy to Commit Murder in the First Degree beyond a reasonable doubt. *Johnson, supra* at 920.

The defendant was also found guilty of homicide. "In the case of first-degree murder, a person is guilty when the Commonwealth proves that: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. An intentional killing is a killing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing. The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. The finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body." *Id.*

In the case *sub judice*, Newman was unlawfully killed by Duncan who shot a bullet through the victim's left ear. The Commonwealth called several witnesses to testify about hearing Duncan brag about the murder. He told Geletei that he was going to kill the victim for Bronson over a drug debt. (T.T. 794: 4-12). Ryan Givens called Duncan after the murder to inform him that Newman had been killed, to which Duncan responded, "snitches get dealt with." (T.T. 1280: 10). He admitted to Bowman that he had killed Newman, and explained how he did

17

it, (T.T. 1032: 11-12), saying that he was in the rear of Newman's car and shot him in the left ear. (T.T. 1032: 19-21). Eric DeLong ("DeLong") encountered Duncan at a bar, (T.T. 847: 16-20), and overheard Duncan say, "yeah, I popped that guy in the back of the head [in] California." (T.T. 850: 9-12). Duncan told Irwin that "[Horner] brought [Newman] out [of] the house and . . . brought him to the car. And [Duncan] was in the car and [Duncan] whacked [Newman]." (T.T. 1473: 11-13). In response to a police interviewer stating that it might have been self-defense, Duncan stated "come on, man, you seen that crime scene, it couldn't have been self-defense." (1643: 14-15).

The jury clearly found that Duncan acted with the specific intent to willfully and deliberately kill Newman. While the "design to kill can be formulated in a fraction of a second," Duncan seemed to reflect on his intent to kill for several weeks. *Mason*, 741 A.2d at 713. The Supreme Court of Pennsylvania has held that the "finder of fact may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body." *Id.* Ample witness testimony reveals that Duncan admitted to shooting the victim in the head. (1643: 14-15; 850: 9-12; 1472: 22-25; 1473: 3-4). The jury had sufficient evidence to find that Duncan had "been lying in wait" in Newman's car before slaying him.

When viewing the facts in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to establish all elements of the offense of Murder of the First Degree beyond a reasonable doubt as to defendant Duncan. *Johnson, supra* at 920.

Paragraph 10 (Motion for Judgment of Acquittal)

Paragraph 10 of defendant's *Concise Statement of Matters Complained of on Appeal* alleges that the trial court erred or abused its discretion in failing to grant a *Motion for Judgment*

18

*of Acquittal* in favor of the defendant, thereby dismissing all charges against him, at the conclusion of the Commonwealth's case-in-chief. Pennsylvania Rule of Criminal Procedure (Pa.R.Crim.P.) 606 provides that "[a] defendant may challenge the sufficiency of the evidence to sustain a conviction of one or more of the offenses charged in one or more of the following ways: (1) a motion for judgment of acquittal at the close of the Commonwealth's case-in-chief;..." Pa.R.Crim.P. 606(A)(1).

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge. *Commonwealth v. Foster*, 33 A.3d 632, 635 (Pa.Super. 2011) (citations omitted). The test to be applied to the defendant's claim that his demurrer was improperly denied "is whether, accepting as true all of the Commonwealth's evidence and all reasonable inferences therefrom, it was sufficient to support a finding by the jury that appellant was guilty beyond a reasonable doubt." *Commonwealth v. Austin*, 631 A.2d 625, 629 (Pa.Super. 1993) (citations omitted). The Comment to Pa.R.Crim.P. 606 notes that although the proper term is now "judgment of acquittal," that the continued use of the term "demurrer" will not affect an otherwise valid challenge to the sufficiency of the evidence. Therefore, case law addressing the granting or denial of a demurrer is equally applicable to the granting or denial of a motion for judgment of acquittal.

As indicated in *Foster, supra*, a motion for judgment of acquittal challenges the sufficiency of the Commonwealth's evidence at a particular point in the trial, here at the conclusion of the Commonwealth's case-in-chief. As the standard for a motion for judgment of acquittal and a challenge to the sufficiency of the evidence are one and the same, the Court relies on its analysis above concerning the sufficiency of the Commonwealth's evidence as to the charges of Conspiracy and Homicide. The Commonwealth, by its evidence and witnesses,

19

sufficiently proved the elements of each crime beyond a reasonable doubt and met its burden in order for the case to proceed to the jury verdict.

Paragraphs 5-7 (Motion to Consolidate)

In Paragraphs 5-7 of defendant's *Concise Statement of Matters Complained of on Appeal*, he alleges that the Court erred in granting Commonwealth's *Motion to Consolidate for Purpose of Trial*, and in failing to later sever the case of *Commonwealth of Pennsylvania v. John Ira Bronson, Jr.*, CP-63-0002217-2011 from his case, *Commonwealth of Pennsylvania v. Michael J. Duncan*, CP-63-CR-0000357-2011. (Docket 95).

Duncan erroneously asserts three theories for which he is entitled to relief in connection with the consolidation and failure to sever the two cases. (Docket 95). He alleges prejudice stemming (a) from evidence that would confuse the jury, (b) from evidence admitted at trial that would have been inadmissible in his own trial, and (c) from the lack of an opportunity to develop antagonistic defenses. *See Commonwealth v. Tolassi*, 392 A.2d 750, 753 (Pa.Super. 1978). However, the Superior Court has recently described the test on which a defendant relies as being merely "persuasive". *Commonwealth v Brookins*, 10 A.3d 1251, 1256 (Pa.Super. 2010); *appeal denied by Commonwealth v. Brookins*, 22 A.3d 1033 (Pa. 2011).

The Commonwealth presented its *Motion to Consolidate* on September 29, 2011, and filed said Motion on October 20, 2011. (Docket 35). Co-defendant Irwin filed a *Motion to Sever* on October 20, 2011. (Docket 36). A hearing on the Commonwealth's *Motion to Consolidate* and the proposed co-defendant responses was held on October 21, 2011, with argument presented by all three proposed co-defendants.[8] The Court granted the Commonwealth's *Motion to Consolidate* by Order of Court dated October 25, 2011, after consideration of all briefs

---

[8] As mentioned *supra*, co-defendant Irwin's case was disposed of on December 14, 2011 via guilty plea.

20

submitted and of the pertinent case law and rules. (Docket 36). Consolidation is controlled by Pa.R.Crim.P. 582, which provides:

> Defendants charged in separate indictments or informations may be tried together if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.

Severance is controlled by Pa.R.Crim.P. 583, which provides:

> The court may order separate trials of offenses or defendants, or provide other appropriate relief, if it appears that any party may be prejudiced by offenses or defendants being tried together.

The Supreme Court of Pennsylvania held that "[j]oint trials are favored when judicial economy will be served by avoiding the expensive and time-consuming duplication of evidence, and where the defendants are charged with conspiracy." *Commonwealth v. Birdsong*, 24 A.3d 319, 336 (Pa. 2011); *citing Commonwealth v. Jones*, 668 A.2d 491, 501 (Pa. 1995). The decision whether to join or sever cases for trial is within the sole discretion of the trial court, and will be reversed only for a manifest abuse of discretion or prejudice and clear injustice. *Commonwealth v. Wholaver*, 989 A.2d 883, 898 (Pa. 2010); *citing Commonwealth v. Newman*, 598 A.2d 275, 277 (Pa. 1991). *See also Commonwealth v. Cousar*, 928 A.2d 1025 (Pa. 2007).

In the instant case, Bronson and Duncan are "alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses," Pa.R.Crim.P. 582(2), and were charged with conspiracy. Consolidation of the cases was proper. Further, the defendant "bears the burden of proving that he was prejudiced by the decision not to sever, and he must show real potential for prejudice rather than mere speculation." *Commonwealth v. Rivera*, 773 A.2d 131, 137 (Pa. 2001). The Court balanced the need to minimize potential prejudice against the general policy of encouraging judicial economy. *Commonwealth v. Janda*, 14 A.3d 147, 155-56 (Pa.Super. 2011). As stated above, "[j]oint trials are favored when judicial economy will be served by avoiding the expensive and time-

21

consuming duplication of evidence, and where the defendants are charged with conspiracy."

*Birdsong*, 24 A.3d at 36. *See inter alia, Commonwealth v. King*, 721 A.2d 763 (Pa.Super. 1998);

*Commonwealth v. Marinelli*, 690 A.2d 203 (Pa. 1997); *Commonwealth v Presbury*, 665 A.2d

825, 828 (Pa.Super. 1995). Hence, refusal to sever was proper.

The defendant alleges jury confusion in Paragraph 5. He claims prejudice because "the

complexity of the evidence as introduced was likely to have caused the jury to be unable to

distinguish the evidence or apply the law as to the charges separately against each Defendant."

(Docket 95).

The Supreme Court of Pennsylvania has defined "prejudice" as it relates to consolidation

and severance in the context of jury confusion stating,

> [Prejudice] is not simply prejudice in the sense that appellant will be linked to the
> crimes for which he is being prosecuted, for that sort of prejudice is ostensibly the
> purpose of all Commonwealth evidence. The prejudice of which [the rule] speaks
> is, rather, that which would occur . . . **because the jury was incapable of
> separating the evidence or could not avoid cumulating the evidence.**

*Commonwealth v. Collins*, 703 A.2d 418, 423 (Pa. 1997) (emphasis added).

The defendant is required to prove that he suffered real potential for prejudice. *Rivera*,

773 A.2d at 137. In the instant case, the evidence was not so complex that it rose to this level of

prejudice. It did not render the jury incapable of separating the evidence as it applied solely to

each defendant or as it applied collectively to both defendants.

Although the testimony and evidence was extensive, it all pointed clearly towards the

Commonwealth's theory of the case, which, at its heart, is quite simple. In fact, the

Commonwealth's theory can be summed up in one sentence. The Commonwealth alleges that

Bronson, after having been set up by the victim who was working as a C.I., hired Duncan to kill

him and Duncan did so.

22

Over the course of seven (7) days of testimony from more than thirty (30) witnesses, the Commonwealth's theory of the case became clearer and more overwhelming. It is difficult to conceive how the evidence of one man hiring another to perform murder would confuse the jury. All evidence of the solicitation was presented as to Bronson. All evidence of the killing was presented as to Duncan. Evidence of the conspiracy was presented as to both.

Despite attempts by both defendants to offer alternative suspects for the killing and solicitation, the jury chose to believe the Commonwealth's theory. The jury decided credibility of witnesses and evidence in favor of the Commonwealth. Even if any confusion had existed, the defendant's burden is to "show real potential for prejudice rather than mere speculation." *Rivera*, 773 A.2d at 137. Based on the weight of all of the evidence, Duncan failed to meet his burden.

Duncan next alleges in Paragraph 6 that irrelevant or inadmissible evidence was considered by the jury. He claims that evidence was admitted at trial "against the Defendant, John Ira Bronson, Jr., that would not have been relevant or admissible in the trial of the Defendant, Michael J. Duncan, if tried alone, and...the jury...likely...consider[ed] said evidence against him...notwithstanding admonitory...instructions." (Docket 95).

The Supreme Court of Pennsylvania, in *Commonwealth v. Brown*, 925 A.2d 147 (Pa. 2007), addressed the issue of relevance and admissibility in a case where co-defendants were charged with conspiracy and murder. The Supreme Court held: "[t]he trial court did not abuse its discretion in denying severance. Conspiracy was charged against both defendants, the other crimes charged were essentially the same, the circumstances giving rise to the murder were the same, and [a common witness'] testimony was the key evidence against both defendants." *Id.* The same is true in the instant case. Here, both men are charged with conspiracy and murder; the narrative is common to both co-defendants; the fact-finder was no doubt aided in its

23

understanding by hearing the full story of both men's involvement; and the testimony of Irwin and Bowman was key evidence against both co-defendants. In fact, the great majority, if not all, of the evidence presented at trial is certainly relevant to both cases as it outlines the complete circumstances of the solicitation, conspiracy, and murder.

Inversely, the defendant points to no specific evidence that would have been inadmissible in an independent trial. The record reveals no evidence that clearly would have been inadmissible against the defendant and had a high probability of being considered against him notwithstanding admonitory instructions. However, even if such evidence exists, the defendant is still required to "show real potential for prejudice rather than mere speculation." *Rivera*, 773 A.2d at 137. Again, the Court finds that the defendant failed to meet this burden.

Moreover, the weight of admissible evidence was more than sufficient to convict the defendant. The respective testimony of Bowman and Irwin stating that they personally witnessed Bronson ask Duncan to kill the victim was admissible. (T.T. 1466: 7- 14). The evidence relative to Bronson's motives was admissible. Duncan's statement to Geletei while they were in jail was admissible. (T.T. 794: 4-12). Duncan's statement to Bowman while on furlough was admissible. (T.T. 1032: 11-12). The statement made by Duncan and overheard by former corrections officer, Eric DeLong, was admissible. (T.T. 850: 9-12). Thus, the defendant has not shown significant prejudice.

In Paragraph 7, the defendant alleges that the Court erred in failing to sever "where antagonistic defenses between the Defendants were present and prejudice resulted to the Defendant, Michael J. Duncan." (Docket 95). At argument on the *Motion to Consolidate*, co-defendant Bronson asserted that potential co-defendants Duncan and Irwin would be prejudiced by "evidence of additional threads of solicitation" that involved Bronson. Further, that there were "lots of moving parts...lots of...prosecution witnesses. A jury simply won't be able to

24

keep each of these pieces of evidence separate from the other Defendants to whom they do not apply." (Consolidation Hearing Transcript ["CHT"] 16: 6-11). Bronson argued that Duncan and another prosecution witness were involved in planning and executing the homicide. (CHT 17; Bronson Docket 27, Exhibit C).

However, where defendants allege a conflicting series of events or antagonistic defenses, this alone is not sufficient to grant a severance, but is merely a factor for the trial court to consider. *See Commonwealth v. Cousman*, 986 A.2d 822 (Pa. 2009) (where co-defendants blamed each other for prompting the homicide, that fact was insufficient to warrant separate trials based on antagonistic defenses). In fact, where conflicting versions of events may be offered, the truth may be more easily decided if co-defendants are tried together. *Rivera*, 773 A.2d at 137; *citing Commonwealth v. Chester*, 587 A.2d 1367, 1373 (Pa. 1991).

Ultimately, and most importantly, the Supreme Court of Pennsylvania held that "[d]efenses become antagonistic only when the jury, in order to believe the essence of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony of his co-defendant." *Commonwealth v. Housman*, 986 A.2d 822, 834 (Pa. 2009).

In the case *sub judice*, the jury was faced with no such necessity. Both defendants denied any involvement. (T.T. 1819 *et seq.*; 1776 *et seq.*). The jury chose to disbelieve both defendants' versions of events and instead relied on the substantial evidence against them. Ergo, there were no antagonistic defenses that caused prejudice necessitating severance.

Testimony of Robert Bedner (Paragraph 8)

The defendant next alleges that the Court erred by allowing Robert Bedner to testify "for the sole purpose of impeaching Mr. Bedner with [a 2003] out-of-court statement." (Docket 95). He also claims that Bedner "recanted [this 2003] out-of-court statement during the Defendant's

25

preliminary hearing." The former is a misstatement of the law and the latter is a misstatement of the facts. (Docket 95).

While it is true that co-defendant Bronson's trial counsel, through a motion *in limine*, argued that Bedner recanted these statements at the preliminary hearing, the Court reviewed and denied same. (Bronson Docket 37). There was no finding that Bedner's statements at the preliminary hearing amounted to a recantation of his 2003 statements. Further, defendant Duncan has failed to allege that the motion *in limine* was improperly denied.[9]

In Paragraph 8 of defendant's *Concise Statement of Matters Complained of on Appeal*, he asserts that the Court should have prevented Bedner from testifying because the Commonwealth called Bedner "for the sole purpose of impeaching" him. (Docket 95). The Court disagrees and does not find that permitting Bedner to testify was improper. The Commonwealth did not call Bedner solely for impeachment purposes because the Commonwealth did not actually impeach Bedner. *Black's Law Dictionary* (9th ed. 2009) defines "impeach" as "to discredit the veracity of (a witness)." Bedner's statements were admitted as Recorded Recollections or as Prior Inconsistent Statements pursuant to Pennsylvania Rule of Evidence (Pa.R.E.) 803.1. Bedner's statements were inconsistent, not because they were contradictory or displayed a lack of veracity, but because his statements merely represented a failure of memory. In fact, the Commonwealth stated,

> Judge, my argument is that under 803.1(3), recorded recollection . . . Mr. Bedner is testifying that he has no recollection of the interview.

(T.T. 1139).

---

[9] Regardless, recantation does not seem to be grounds for exclusion as the Supreme Court of Pennsylvania, in *Commonwealth v. Brown*, 52 A.3d 1139, 1170 (Pa. 2012), recently upheld a conviction basely *solely* on prior inconsistent statements that were later recanted.

26

Pa.R.E. 803.1(3) states that,

> [t]he following statements, as hereinafter defined, are not excluded by the hearsay rule if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement:
>
> . . .
>
> (3) Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory, providing that the witness testifies that the record correctly reflects that knowledge. If admitted, the memorandum or record may be read into evidence and received as an exhibit, but may be shown to the jury only in exceptional circumstances or when offered by an adverse party.

This Court recognizes: "[t]his exception only applies where the witness lacks a present recollection of the event." *Commonwealth v. Young*, 748 A.2d 166, 177 (Pa. 1999). In *Commonwealth v. Cooley*, 398 A.2d 637, 641 (Pa. 1979) it was held,

> [b]efore the content of a writing becomes admissible under [the recorded recollection] exception, the proponent must lay a foundation to show that four requirements are met: 1) the witness must have had firsthand knowledge of the event; 2) the written statement must be an original memorandum made at or near the time of the event and while the witness had a clear and accurate memory of it; 3) the witness must lack a present recollection of the event, and 4) the witness must vouch for the accuracy of the written memorandum.

Bedner was called as a witness and testified. (T.T. 1134 *et seq.*) When he could not recall the content of the interview, a transcribed copy was provided to him. (T.T. 1136: 21-23). His recollection was still not refreshed and the Commonwealth was permitted to play a portion of a recording that was in the possession of the defense "for about four months". (T.T. 1144-1157; 1150: 19). The witness was shown to have first-hand knowledge of the report when he asked if he recalled being interviewed by the PSP and he responded "yes." (T.T. 1134: 21-23). The recollection was a transcript of an audiotape. The witness vouched for the accuracy of the

27

document when he was asked if he was truthful in the interview and he responded, "I would say yes." (T.T. 1136-1137).

The recording would also have been admissible under Pa.R.E. 803.1(1) which states that out-of-court statements are "not excluded by the hearsay rule if the declarant testifies at the trial or hearing[,] is subject to cross-examination concerning the statement, [the] statement by [the] declarant . . . is inconsistent with the declarant's testimony, and . . . [the statement] is a verbatim contemporaneous recording of an oral statement." Such statements "are admissible as substantive evidence[.]" *Commonwealth v. Stays*, 40 A.3d 160, 165 (Pa.Super. 2012). Pa.R.E. 613(b) states that "extrinsic evidence of a prior inconsistent statement by a witness is admissible only if, during the examination of the witness, (1) the statement, if written, is shown to, or if not written, its contents are disclosed to the witness; (2) the witness is given an opportunity to explain or deny the making of the statement; and (3) the opposing party is given an opportunity to question the witness."

Bedner's prior inconsistent statements were thoroughly attacked on cross-examination. He admitted to being a drug addict (T.T. 1166: 8-9); that he had drugs in his system when he made the 2003 statements (T.T. 1166: 22-24); that he was facing charges and was offered a deal in return for his testimony (T.T. 1166: 4-8). He recalled testifying at the preliminary hearing. (T.T. 1167: 5-8). He recalled testifying that it was "[h]ighly possible" that he lied in the PSP interview. At trial, he instead chose to call the likelihood that he lied merely "possible". (T.T. 1169: 3-4).

Although it is necessary to analyze the admissibility of the audio-taped statement to show other reasons for Bedner being permitted to testify, the precise allegation of error is that Bedner was allowed to testify at all. He was not called solely for impeachment purposes, but rather the Commonwealth anticipated that he would testify consistently with his 2003 statements. When

28

Bedner proved unable or unwilling to remember the 2003 testimony, it was properly admitted pursuant to Pa.R.E. 803.1(1) and 803.(3) as substantive evidence or a recorded recollection.

Paragraph 9 (Victim's Confidential Informant [C.I.] File)

Duncan alleges that the Court erred or abused its discretion when it denied defendant Bronson's *Petition to Compel Production of the Victim's Confidential Informant (CI) File*.[10] (Docket 62, 95). He claims that the contents of the C.I. file "might have affected the outcome of trial if it were shown that the Defendant was not the only law enforcement target against whom the victim informed upon, where said CI-target relationship was the basis for the Commonwealth's arguing motive." (Docket 95).

He claims that the Court should have granted the Petition and ordered the Commonwealth to produce a document that did not exist. As same was impossible to grant, the Court must presume that this allegation of error is based on a violation of defendant's Federal Due Process rights.[11]

The Supreme Court of Pennsylvania held that "[t]he Due Process Clause of the Fourteenth Amendment requires defendants be provided access to certain kinds of evidence prior to trial, so they may be afforded a meaningful opportunity to present a complete defense." *Commonwealth v. Chamberlain*, 30 A.3d 381 (Pa. 2011) (citations and quotations omitted). The Court also stated that the Commonwealth must produce all "evidence which is exculpatory and material to guilt or punishment . . . and to turn over exculpatory evidence which might raise a reasonable doubt about a defendant's guilt, even if the defense fails to request it[.]" *Id.* at 402.

---

[10] The Court notes that the Petition was denied as moot because the evidence had been destroyed pursuant to a PSP document retention policy. (Bronson Docket 55).

[11] While the Court "may interpret provisions of the Pennsylvania Constitution to provide greater protection than their federal counterparts, [the Court in *Chamberlain*] decline[d] to entertain such an interpretation[ .]" *Chamberlain*, 30 A.3d at 403.

29

However, "[w]hen the state fails to preserve evidence that is potentially useful, there is no federal due process violation unless a criminal defendant can show bad faith on the part of the police . . . In evaluating a claim that the Commonwealth's failure to preserve evidence violated a criminal defendant's federal due process rights, a court must first determine whether the missing evidence is materially exculpatory or potentially useful." *Id.* at 402. (citations and quotations omitted).

Presuming that defendant Duncan adopted co-defendant Bronson's Petition, he still did not raise bad faith on the part of the Commonwealth. The Trial Court found by its December 27, 2011 Order that "the Commonwealth indicated that the [PSP], following standard state police practice regarding a person's confidential informant file, purged [Newman's] confidential informant file in 2009 (following a five (5) year requirement to maintain this type of file)[.]" (Bronson Docket 55). As the PSP destroyed this file two years prior to the filing of charges in this case and pursuant to a standard document retention policy, the Court cannot characterize the Commonwealth's failure to preserve the evidence as being done in bad faith.

As to whether the evidence was "materially exculpatory or potentially useful[,]" the Supreme Court of Pennsylvania has "recognize[d] [that] this [determination] is a treacherous task, requiring a court to divin[e] the import of materials whose contents are unknown and, very often, disputed." *Commonwealth v. Snyder*, 963 A.2d 396, 405 (Pa. 2009). Further, evidence which "is [only] possibly exculpatory is only [considered] potentially useful . . . [and] the loss of [such evidence] creates a constitutional deprivation only if the Commonwealth acted in bad faith." *Chamberlain*, 30 A.3d at 402 (citations and quotations omitted).

Here, the contents of the C.I. file are not wholly unknown. The defendant alleged that the file contained the names of others on whom Newman had informed. They would have been used to show that "the Defendant was not the only law enforcement target against whom the victim

30

informed upon." (Docket 95). Such evidence could show that others may have solicited the victim's killing, but it would not exonerate Duncan. Defendant Bronson's *Omnibus Pretrial Motion No. 3* characterized the information within the C.I. file as only "possibly and/or likely to be favorable to the Defendant[.]" (Bronson Docket 47). Bronson, and Duncan by adoption, apparently viewed the evidence as merely "potentially useful" rather than "materially exculpatory". Ergo, the evidence contained in the C.I. file should be considered only "possibly exculpatory" and, therefore, "potentially useful", rather than "materially exculpatory". As such, the Commonwealth exhibited no bad faith; and the defendant's due process rights were not violated by the destruction of and failure to produce the victim's C.I. file.

## Legal Analysis of Pre-Trial and Trial Evidentiary Rulings

The Court will now address the alleged complaints of error in the evidentiary rulings of the trial judge as set forth in Paragraphs 12-57 of defendant's 1925(b) statement, despite the fact that appellate counsel did not cite a transcript page; did not always cite the witness' name; did not cite a controlling Order of Court involving pre-trial motions; at times, was redundant; and, used broad, general, and vague language in some allegations of error. The Court, nevertheless, believes it found the evidentiary rulings from its review of the transcript and from the trial court's orders on pre-trial motions and addresses the issues as succinctly and as clearly as possible. Many of these complaints could have been dismissed due to the above-mentioned short-comings, but the Court will respond to them for the sake of the present and future appeals. Again, the Court is mindful of Pa.R.A.P. 1925(b)(4)(ii) and (iv).

Paragraph 12

Defendant claims that the Commonwealth made improper references to drugs, drug use, and drug dealing during its opening and closing statements and throughout trial. (Docket 95). An opening statement is meant to inform the jury about the case, its background, and what each side

31

intends to prove, but is not evidence. *Commonwealth v. Satzberg*, 516 A.2d 758 (Pa.Super. 1986). The District Attorney need not conclusively establish all statements made during opening remarks, but a good-faith, reasonable basis must exist to believe that particular fact will be established. *Id.* In the instant case, the Commonwealth made references to the drug dealing business in order to outline its case theory to the jury, provide for a development of the facts, and most importantly, to demonstrate the motive for both the conspiracy and the murder. The probative value of such motive, intent, and planning evidence in the instant case was immense. Pa.R.E. 404(b).

The Commonwealth's statement as to the drug dealing business cannot be said to be prejudicial as the statements were substantiated by ample evidence at trial, and the trial court instructed the jury that the statements and arguments of counsel were not evidence, that the defendant enjoyed the presumption of innocence, and that the Commonwealth had the burden of proof. *Commonwealth v. Montalvo*, 986 A.2d 84 (Pa. 2009). The Commonwealth elicited testimony from numerous witnesses concerning the involvement of the drug dealing business in this case as such elicitation was necessary to develop the factual background of the case and to establish the motives of both Bronson and Duncan. The Commonwealth's references to the drug dealing business in its opening statement were made with a good-faith, reasonable belief that such references would be substantiated by its evidence and testimony; and they were. The testimony of witnesses Geletei, Hull, Bedner, and Dzurco and the plethora of evidence presented substantiated those references during trial. Lastly, the references made in the Commonwealth's closing argument served to summarize the Commonwealth's case and the evidence it presented. The prosecutor's comments were proper and defendant's claim is without merit.

Paragraph 13

32

In defendant's issue number 13, counsel alleges that the trial court erred or abused its discretion in permitting the use of a videotaped and recorded statement of defendant, Michael Duncan, in a Pennsylvania Court where such video and recorded statement was created in Ohio. After a hearing and upon consideration of defendant's *Omnibus Pre-Trial Motion – Motion to Suppress Statement* (Docket 68), the Court issued an Order dated January 12, 2012, denying the Motion for all of the reasons set forth in its Order. (Docket 69). The Court welcomes a review of its Order at Docket 69, but notes that the Commonwealth did not introduce the videotaped and recorded statement of Michael Duncan created in Loraine, Ohio, during the jury trial. Therefore, there is no merit to this issue as it is moot.

Paragraph 14

In defendant's issue number 14, counsel alleges that the trial court erred or abused its discretion in permitting Brian Horner to refresh his recollection of his statements to police by reviewing the report written by police after he had testified that he could not remember anything about the night of February 3, 2003. In its ruling, the Court relied upon Pa.R.E. 612 – Writing or Other Item Used to Refresh Memory – in overruling the objections of defense counsel. Pursuant to the Rule cited and *Bernstein's Pa. Rules of Evidence* (2010 Ed.), Rule 612 at pp. 482-491, it is clear that any memorandum can be used to refresh a witness' recollection regardless of authorship. *See* discussion on the record at T.T. 259-265. There is no merit to this issue as almost anything can be used to refresh a witness' recollection.

Paragraph 15

In defendant's issue number 15, appellate counsel alleges that the trial court erred or abused its discretion in permitting Amelia Pajerski to answer questions regarding statements by the decedent-victim to her over objections of defense counsel citing inadmissible hearsay. Without a citation to the transcript page, the Court believes that appellate counsel is referring to

33

objections by trial counsel at T.T. 324-330. The trial court relied upon Pa.R.E. 801(14); 803.1; and 803.3 in admitting this testimony and overruling the objection.

Paragraph 16

In defendant's issue number 16, appellate counsel alleges that the trial court erred in overruling defense counsel's objection and in permitting the Commonwealth to question Melissa Nelson about her dealings with defendant, Michael Duncan, and with Howard Edward Irwin, Jr. Appellate counsel argues that the admission of this testimony prejudiced the defendant and that the testimony's prejudicial effect outweighed any probative value. (Docket 95). The Court believes appellate counsel is referring to T.T. 410-412. Although trial counsel was given an opportunity at sidebar to specifically articulate his objection, Attorney Shrager stated that he was objecting for the record but making no argument. (T.T. 412). The trial court overruled the general objection and supported that ruling with Pa.R.E. 103(a)(1) in that defense counsel never stated a specific ground for objecting to the question or line of questions. Furthermore, this whole case involved the business of drug sales, drug usage, and the murder of John Newman – all intertwined. The Commonwealth's evidence could not have been presented without references to drug usage, drug sales, and drug trafficking. It is noted that defense counsel cross-examined many Commonwealth witnesses on the issue of the witness' drug habits and whether they were under the influence of controlled substances at the time in question.

Paragraph 17

In defendant's issue number 17, appellate counsel alleges that the trial court erred in permitting the Commonwealth, over defense objection, to play a recorded statement of Melissa Nelson without a transcript of the statement and without an adequate foundation. Again, no page citation was provided but upon the Court's review, at T.T. 422-458, these issues were argued outside the hearing of the jury. The trial court relied upon Pa.R.E. 803.1(1)(c) in permitting the

34

playing of Melissa Nelson's recorded statement. The trial court admitted the inconsistent statement of Melissa Nelson as it was a verbatim contemporaneous recording of an oral statement; Melissa Nelson testified at trial; and, she was subject to cross-examination concerning the statement.

Also, in Paragraph 17, appellate counsel alleges that in permitting the playing of the verbatim contemporaneous recording of an oral statement by Melissa Nelson, the trial court permitted the introduction of hearsay evidence which should have been redacted – no page citations provided. At T.T. 449 – 481, the transcript covered this issue and all others raised in Paragraph 17. At T.T. 479, Duncan's trial counsel withdrew his request for a cautionary instruction regarding the car rental testimony from the recorded oral statement. Also at T.T. 481, defense counsel admitted that he had received a copy of the recorded oral statement in mid-December 2011 and never filed a motion in limine on any aspect of the recorded oral statement of Melissa Nelson.

Paragraph 18

In defendant's issue number 18, appellate counsel alleges that the trial court erred in permitting the Commonwealth to introduce a hypothetical question to an expert witness "where there was no foundation . . . no adequate time reference . . ." (Docket 95). Appellate counsel did not identify the expert witness by name, and there were numerous experts who testified during this trial, nor was a transcript page cited, but the Court identified the objection from its review of the trial transcript. The Commonwealth directed a hypothetical question to Jason Evans, a forensic scientist supervisor with the Harrisburg Regional Crime Laboratory of the PSP at T.T. 668. After a lengthy sidebar discussion, the Commonwealth withdrew the hypothetical question. (T.T. 668-677). Therefore, this issue is moot.

35

Paragraph 19

In defendant' issue number 19, appellate counsel alleges that the trial court erred or abused its discretion in overruling a defense objection pertaining to a question to expert witness, Trooper Aaron Borello, as to whether Brian Horner indicated to him that he (Horner) had participated in a drug transaction with John Newman, decedent, the night before Newman's body was found. The Court overruled the hearsay objection as a hearsay exception applied. The statement was a statement against interest and it laid the foundation for an opinion question to the expert witness. *See* Pa.R.E. 702, 719-731. The expert opinion established that individuals who participate in a drug trafficking distribution business together have a normal working relationship and share a degree of trust. (T.T. 730).

Paragraph 20

In defendant's issue number 20, appellate counsel alleges that the trial court erred or abused its discretion in interrupting Attorney David Shrager, *sua sponte*, throughout the trial when no objection had been lodged, thereby demonstrating through its statements and questions how the case should be decided. No citations whatsoever were included in this general, vague, and outlandish claim. This trial consumed nearly a 2,000 page transcript. Attorney Shrager was given great latitude to object, argue, and raise issues at sidebar and during in-chamber meetings prior to and at the close of court each day. The review of the record will confirm that the trial court never made statements before the jury or outside the presence of the jury to articulate through words or actions "where it believed the case should go with regard to the conviction of the Defendant." (Docket 95). To the contrary, a review of the record will demonstrate that the trial court treated Attorney Shrager and defendant, Michael Duncan, and all involved with a great deal of patience, fairly and respectfully at all times. Attorney Shrager had unfettered opportunity,

36

time, and latitude to defend his client and try his case within the bounds of the Rules of Evidence and Rules of Criminal Procedure without any inappropriate remarks or expressions from the trial judge.

Paragraph 21

In defendant's issue number 21, appellate counsel alleges that the trial court erred or abused its discretion in not removing Juror #3 from the jury when a local attorney reported to defense counsel that Juror #3 had been involved in county conservative politics and had supported Eugene Vittone for District Attorney in the 2011 elections. The following synopsis of events better explains the nature of the issue and the rationale for the trial court's ruling.

An issue arose during trial on January 18, 2012, when Attorney Sean Logue reported to Attorney Keith Emerick, counsel for John Ira Bronson, Jr., who reported to Attorney David S. Shrager, counsel for Michael J. Duncan, that Juror #3 was involved in county conservative politics and had supported Eugene Vittone for District Attorney in 2011. This matter developed on the record at T.T. 976-983, at which time the trial court took the matter under advisement and moved on to another witness, Coroner Timothy Warco, whose testimony finished the morning session. Prior to returning to the courtroom after the lunch recess, the trial court met in chambers with counsel to review the facts and explain its ruling and ultimately met with Juror #3 in the presence of all counsel. The facts can best be summarized by including the statement prepared by the trial judge's law clerk, Amanda Kraft, Esq., upon the trial judge's request:

> This morning, January 18, 2012, immediately following morning break, I was approached by Juror #3 regarding a concern which had arisen during break, heeding the Judge's instruction prior to break regarding being approached regarding the case. He stated that during break, as he was returning through the metal detectors after taking a cigarette break, he was approached by Attorney Sean Logue. He stated that he knew Sean Logue, and Mr. Logue approached him, asked whether he was a Juror, and then asked whether he was on the murder trial. The Juror stated to me, that he told Mr. Logue he could not talk about it, walked away with the other jurors and returned to the courtroom. Two other jurors, #4

37

and #8, were apparently standing near Juror #3 and may have overheard the conversation.

Juror #3 was concerned about being approached, then was more concerned when Mr. Logue entered the courtroom and approached Mr. Emerick's counsel table. The Juror was afraid that Mr. Logue was also working on the case or was somehow involved in this case as a witness. He immediately mentioned a problem to Tim Relich (trial judge's court crier/law clerk) when he was first approached by Mr. Logue, then spoke to me once entering the room and seeing Mr. Logue with Mr. Emerick. I immediately brought Juror #3's concern to the Judge.

Both Attorneys Shrager and Emerick asked that Juror #3 be dismissed although all attorneys in chambers agreed that politics has no bearing on a juror's removal. Attorney Shrager stated that he had nothing to support the request for the removal of Juror #3. The Commonwealth opposed the defense request to remove Juror #3. The Court denied the motion but agreed to inform Juror #3 of the fact that all parties were aware of his concerns regarding Attorney Sean Logue, who was not involved in the case whatsoever as a lawyer or as a witness; that he had followed instructions completely and properly; and would remain as Juror #3. *See* T.T. 994-1004.

Paragraph 22

In defendant's issue number 22, appellate counsel alleges that the trial court erred or abused its discretion in permitting Michael Bowman, a Commonwealth witness, to testify over defense counsel's objection about a letter that he had written stating that he was setting up the defendants for crimes they did not commit but then recanting and testifying that the content of the letter was not true. Again, the Court searched for the page citation, T.T. 1032-1037, pertaining to Commonwealth's Exhibits #33 and #34. Attorney Shrager lodged a hearsay objection to Exhibit #33, the letter, with no supporting argument or Rule of Evidence citation. The trial court overruled the objection to Exhibit #33 as the witness wrote the letter, testified about it, and was subject to cross-examination. The Commonwealth introduced another letter,

38

Exhibit #34, during this portion of Bowman's testimony, and no objection was lodged regarding that letter.

Paragraph 23

In defendant's issue number 23, appellate counsel alleges that the trial court erred in permitting the Commonwealth to question witness, Michael Bowman, on re-direct examination regarding Commonwealth's Exhibit #35. Again, no page citations were provided, but the Court believes that counsel may be referencing transcript pages 1099-1108 where the witness was questioned as to the Grand Jury proceedings and a PSP interview. During that portion of the witness' testimony, the prosecutor asked the witness if he had testified during the Grand Jury proceeding or told the PSP in an interview about a three-way phone call in which he heard Michael J. Duncan admit to killing the victim. (T.T. 1103). The prosecutor indicated that he was asking the question as Attorney Shrager had questioned the witness on cross-examination as to why he did not mention such a phone call during the Grand Jury proceeding, thus implying that he had fabricated the existence of the phone call and the defendant's comment. (T.T. 1100). The prosecutor properly used the report of the PSP interview, in which the witness did mention the phone call and the defendant's statement, in an effort to rehabilitate the witness and rebut Attorney Shrager's recent, implied allegation of fabrication on the part of the witness. The prosecutor's question on re-direct examination was proper under Pa.R.E. 613(c), and, therefore, defendant's claim lacks merit.

Paragraphs 24-27

In defendant's issues 24-27, appellate counsel has set forth several allegations of the trial court's error or abuse of discretion regarding the testimony of Commonwealth witness, Robert Bedner – some of which were subject to a defense *Motion in Limine*. The Court has reviewed the issues pertaining to the testimony of Robert Bedner in its analysis of Paragraph 8 of the

39

defendant's *Concise Statement* and relies upon that analysis as to the matters raised in Paragraphs 24-27.

Paragraph 28

The language of issue 28 is too vague for the Court to effectively address. (Docket 95). The Court believes that the defendant is alluding to an audio recording associated with the testimony of Robert Bedner, but is unsure, as there is no citation to a specific document or piece of evidence. Therefore, inasmuch as the issue relates to the admissibility of Robert Bedner's testimony and the use of his recorded statements made during an interview with the PSP, the Court relies on its analysis of *Concise Statement* Paragraph 8.

Paragraph 29

In defendant's issue number 29, appellate counsel alleges that the trial court erred in failing to grant a mistrial when Brooke Anthony testified that Defendant Michael Duncan pulled a gun and aimed it at her and that the trial court erred in failing to give a cautionary instruction to the jury regarding this matter. The event involving the gun was alleged to have happened one or two years before Newman's murder. (T.T. 1251). Again, there were no page references in the *Concise Statement*, but the Court believes that counsel is referring to T.T. 1247-1264 where the trial court took defense counsel's motion for a mistrial under advisement and soon thereafter gave a cautionary instruction to the jury at T.T. 1264 as had been requested. At T.T. 1313-1318, the mistrial motion was argued at sidebar when the jurors were dismissed.

The Supreme Court of Pennsylvania has enunciated the standard of review for the denial of a request for a mistrial as:

> [T]he remedy of a mistrial is an extreme one.... It is primarily within the trial court's discretion to determine whether Appellant was prejudiced by the event that forms the substance of the motion. Finally, it must be remembered that a mistrial is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial.

40

*Commonwealth v. Montgomery*, 626 A.2d 109, 112-13 (Pa. 1993) (citations omitted). Here, the Commonwealth argued the facts, provided case law and cited the pertinent Rules of Evidence against the grant of a mistrial. Attorney Shrager argued the facts of his motion, but again presented no case law or Rules of Evidence in support of his mistrial motion. Ultimately, the trial court denied the motion for a mistrial relying upon the cases cited by the Commonwealth, Pa.R.E. 404(b) and 406, the trial court's curative instruction, and citations to *Bernstein's Pa. Rules of Evidence* (2010 Ed.), pp 1317-1318. It is noted that Attorney Shrager did not file a motion in limine regarding this testimony although he was provided a copy of Brooke Anthony's witness statement well in advance of trial. The request for a mistrial was properly denied as any potential for prejudice was cured by the giving of a cautionary instruction.

Paragraph 30

In defendant's issue number 30, appellate counsel alleges that the trial court erred in permitting Attorney Keith Emerick, counsel for Defendant Bronson, to ask witness Givens if Duncan was Howard Irwin's bodyguard and if Duncan would take care of Irwin's problems. Defendant alleges that this line of questioning presented antagonistic defenses requiring severance of the trials. The Court previously analyzed the *Motion to Consolidate* issue in its analysis of *Concise Statement* Paragraphs 5-7 and relies upon that analysis here. However, the Court believes that appellate counsel is referencing T.T. 1281-1288 and does not agree that the questions necessarily raised antagonistic defenses between the co-defendant, Bronson, and Duncan, requiring the severance of the trials.

Paragraph 31

In defendant's issue number 31, appellate counsel alleges that the trial court erred or abused its discretion in not granting defendant's motion for a mistrial when the Deputy Sheriff walked Duncan unshackled into the courthouse after a lunch break and past the Jury

41

Commissioners lounge where the jurors were located. The facts were analyzed (defendant was not wearing handcuffs or shackles but was wearing a security band under his clothing) and pertinent case law was provided by the Commonwealth and discussed amongst the parties. During this recorded proceeding, Attorney Shrager conceded that he would make no further legal argument on his mistrial motion but, nevertheless, wanted a ruling on his mistrial motion. (T.T. 1342-1345). The Court asked the Commonwealth and Attorney Shrager if either was requesting a cautionary instruction. The Commonwealth responded that they were not and defense counsel's response was not clear, which the Court took to be an answer in the negative. The motion for a mistrial was properly denied and there is no merit to this claim. *Montgomery, supra* at 112-13.

Paragraph 32

In defendant's issue number 32, appellate counsel alleges that the trial court erred or abused its discretion in permitting Assistant Public Defender Charles Carpinelli to testify regarding a plea offer made to his client, Michael McCarthy, who testified as a Commonwealth witness. In reviewing Attorney Carpinelli's entire testimony, the Court notes that Attorney Shrager lodged no objections whatsoever and asked no questions on cross-examination. (T.T. 1440-1449). Clearly, this issue has no merit as the failure to raise an objection during trial waives that objection and precludes it from being considered on appeal. *Commonwealth v. Collins*, 424 A.2d 1254 (Pa. 1981).

Paragraph 33

In defendant's issue number 33, appellate counsel alleges that the trial court erred or abused its discretion in permitting Trooper Monkelis to testify as to when co-defendant Bronson was identified as a potential suspect and why Bronson was a suspect. Again, no transcript pages were cited, but the Court notes that, at T.T. 1623-1624, Attorney Shrager objected to questions

42

and his objections were overruled on the grounds of relevancy, course of police conduct, and motive.

Paragraph 34

In defendant's issue number 34, appellate counsel alleges that the trial court erred or abused its discretion in permitting Trooper Monkelis to testify as to an alleged hearsay statement made by witness Jamie Webb concerning an alternate theory of the case. This is a non-issue as after sidebar arguments, the Commonwealth did not continue with this line of questioning. Trooper Monkelis never answered the objected-to question. (T.T. 1629).

Paragraph 35

In defendant's issue number 35, appellate counsel alleges that the trial court erred or abused its discretion in denying Attorney Shrager's request for a mistrial when it proceeded beyond 4:30 p.m. one day and beyond 6:00 p.m. another day when Attorney Shrager indicated that he was tired. During two and one-half weeks of jury trial, the Court closed by 4:30 or 5:00 p.m. each day – some days earlier – and two days a little later. The record establishes that on January 20, 2012, court ended at about 6:05 p.m. (T.T. 1693). On January 23, 2012, court concluded at about 6:00 p.m. (T.T. 1904). A reading of the entire transcript will establish that at times Mr. Shrager agreed to work late, but then later objected to working past 4:30 p.m. The trial judge is in charge of the operation of the courtroom and never abused her discretion regarding the hour of the day or the clock. Never were the rights of any party impaired by the timeline of the jury trial, and the denial of a request for a mistrial was proper. *Montgomery, supra* at 112-13.

Paragraph 36

In defendant's issue number 36, appellate counsel alleges that the trial court erred or abused its discretion in not giving a charge on third degree murder and involuntary manslaughter. At T.T. 1699-1720, the Court reviewed the charge in chambers with counsel.

43

Attorney Shrager on behalf of Defendant Duncan did not file a request for jury charge, but joined in Attorney Emerick's request for jury charge on behalf of co-defendant Bronson. All of Co-defendant Bronson's specific requests for charge were granted by the Court and there was no request for a charge on third degree murder or manslaughter. On January 23, 2012, the trial concluded. When the jury was charged on January 24, 2012, Attorney Shrager orally requested a charge on third degree murder and involuntary manslaughter. (T.T. 1702). Upon consideration and after arguments by counsel, the Court denied that request. (T.T. 1702-1709).

Both co-defendants were charged with Conspiracy to Commit Homicide along with Criminal Homicide – First Degree Murder. There was no evidence presented from the Commonwealth or by defense counsel to support a charge of Third Degree Murder or Manslaughter. This was an execution-style killing with a single gunshot fired into the victim's ear, committed with premeditation, malice, and the specific intent to kill. Legally, there is no such crime as conspiracy to commit third degree murder or manslaughter as the specific intent element is absent. *Commonwealth v. Clinger*, 833 A.2d 792 (Pa.Super. 2003). Although a defendant can be found guilty of third degree murder under a complicity theory, the facts of this case clearly indicated the existence of a conspiracy and the commission of a premeditated killing with malice aforethought. *Commonwealth v. Roebuck*, 32 A.3d 613 (Pa. 2011). "The ultimate gradation of the crime accomplished does not in and of itself delimit the degree of crime originally planned-the crime ultimately accomplished does not retroactively limit the scope of the original conspiracy." *Commonwealth v. Weimer*, 977 A.2d 1103, 1105 (Pa. 2009). Here, a conspiracy was entered into to commit a premeditated, execution-style killing and that exact goal was later accomplished when Defendant Duncan shot the victim in the head at close range.

Also, Attorney Shrager's oral request was late and in violation of Pa.R.Crim.P. 647(A). Further, at the conclusion of the charge, when the attorneys were requested to state any

44

objections or corrections to the charge, Attorney Shrager made comments. but none included an objection to the Court's not giving a charge on Third Degree Murder or Manslaughter; thus, this issue has been waived pursuant to Pa.R.Crim.P. 647(B).

Paragraph 37

In defendant's issue number 37, appellate counsel alleges that the trial court erred or abused its discretion in denying a request for a jury instruction regarding inflammatory photos. Orally, Attorney Shrager requested a charge on inflammatory photos in chambers on the record on January 23, 2012. The trial court agreed to give the inflammatory photo charge (T.T. 1709-1711) and, in fact, gave the inflammatory photo instruction. While the jury charge is not transcribed in Washington County unless specifically requested by an attorney, the trial judge requested the court reporter to verify from her records that the inflammatory photo instruction was given. The Court confirmed that it was. Also, at the conclusion of the charge when the attorneys were brought to sidebar and asked for any objections or corrections regarding the charge, Attorney Shrager did not mention that the Court failed to give the charge on inflammatory photos. Thus, this issue has also been waived pursuant to Pa.R.Crim.P. 647(B). (T.T. 1926-1932).

Paragraph 38

The Court relies on its previous analysis of the consolidation/severance issue as contained within Paragraphs 5-7 of the *Concise Statement* as its reply to defendant's continued claim that the trials should have been severed. (Docket 95). Concerning the issue of an alleged *Bruton* violation and failure to grant a mistrial, the Court finds this claim to be completely without merit as both defendants testified and were thoroughly cross-examined not only by the prosecutor, but also by counsel for their respective co-defendant. (T.T. 1776-1797, 1819-1881). The rule of *Bruton v. United States* provides "that a defendant is deprived of his rights under the

45

Confrontation Clause when his *nontestifying* codefendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the codefendant." The rule "exists as a 'narrow exception' to the general rule that cautionary instructions to the jury may be sufficient to eradicate the prejudice that may arise where evidence is admitted against only one of multiple defendants in a joint trial." *Commonwealth v. Brown*, 925 A.2d 147, 149 (Pa. 2007) (*citing Bruton v. United States*, 391 U.S. 123 (1968) (emphasis added) (citations omitted)). Therefore, there was no testimony given that would merit a mistrial as there was no *Bruton* violation. *Montgomery, supra* at 112-13.

Paragraph 39

The Court is unsure as to the exact allegation(s) of error contained within Paragraph 39 of defendant's *Concise Statement*. (Docket 95). It seems that the defendant is claiming that error occurred meriting a cautionary instruction or the granting of a mistrial when the Commonwealth noted that Washington County District Attorney John Pettit (now deceased) was *not* involved in the prosecution of the instant case. (T.T. 1635-1636, 1911-1913). During District Attorney's Pettit's time in office, there were allegations of improper and even criminal activity, but no charges were ever filed.

It appears that the defendant is claiming that the Commonwealth improperly attempted to remove an alleged inference of corruption from its case by disclaiming late District Attorney Pettit's involvement in its investigation and preparation. Although such evidence and testimony may have been irrelevant under the circumstances, the defendant has waived such a challenge by making an extremely general objection at trial (T.T. 1635), not requesting a cautionary instruction or a mistrial during trial (T.T. 1635), and by not raising the issue as such in his *Concise Statement*. The involvement, or lack thereof, of a certain prosecutor employed by the Washington County District Attorney's Office, including the District Attorney himself, would be

46

factual in nature and in no way could be improper as it is not evidence at all. Defendant has not even begun to approach the high burden required for the granting of a mistrial on this issue. *Montgomery, supra* at 112-13.

Paragraph 40

The defendant claims in Paragraph 40 of his *Concise Statement* that the trial court erred when it did not grant a motion for judgment of acquittal based on the scientific evidence, specifically gunshot residue testing, presented by the Commonwealth with respect to Brian Horner, Defendant Duncan, and the victim. (Docket 95). The Court relies on its analysis of the "motion for judgment of acquittal at the conclusion of the Commonwealth's case-in-chief" issue as contained within its analysis of Paragraph 10 of the *Concise Statement.*

Paragraph 41

In defendant's issue number 41, appellate counsel alleges that the trial court erred or abused its discretion in denying defense counsel's motion to remove Juror #6 based upon her familiarity with a proposed witness in this case. Again, counsel provided no trial transcript citation, but upon review, the Court thoroughly disposed of this issue at T.T. 930-940, 994-998. Juror #6 was interviewed with all counsel present and based upon her answers to questions, there was no reason to grant the motion to remove Juror #6 from the jury. The trial court properly denied the motion to have Juror #6 removed and this claim is without merit.

Paragraph 42

In defendant's issues 42, 46, and 53, appellate counsel alleges that the trial court erred or abused its discretion in denying Defendant Duncan's *Omnibus Pre-Trial Motions – Motions to Suppress* regarding events in Lorraine, Ohio, Miranda issues, statements, etc. There is vagueness and lack of clarity in some of these allegations, but the Court held a hearing on Defendant Duncan's *Omnibus Pre-Trial Motions – Motions to Suppress* (Docket 25, 26, 68) pertaining to

47

events from Lorraine, Ohio, the Miranda issues raised, Duncan's statements to police, etc. In the second page of the *Court Order* dated October 31, 2011, at Docket 49, the trial court disposed of those issues citing facts from the hearing and pertinent cases establishing controlling law. The Court relies upon these documents and analysis. Furthermore, regarding issue 53 and Docket 68-69, the videotape and recorded statement from Lorraine, Ohio, was never introduced during trial in Washington County, Pennsylvania. Therefore, the claim is a non-issue and moot at best.

Paragraph 43

In defendant's issue number 43, appellate counsel alleges that the trial court erred or abused its discretion in denying defendant's *Omnibus Pre-Trial Motion – Motion to Suppress Testimony*, but no trial transcript citations were noted and no particular witness(es) were named. This appears to be a broad and vague allegation challenging the credibility of Commonwealth witnesses due to drug usage, prior criminal records, etc. All Commonwealth witnesses were open for cross-examination and answered appropriate questions on such matters. The credibility of witnesses is within the province of the jury. The Court can provide no more specific analysis as the allegations were drawn with such broad and vague strokes.

Paragraph 44

In defendant's issue number 44, appellate counsel alleges that the trial court erred or abused its discretion in that it denied defendant's *Omnibus Pre-Trial Motion* requesting the transcripts of the Grand Jury proceedings. Defendant's *Motion to Compel Grand Jury Transcripts* was presented and granted by this Court on September 22, 2011. (Docket 23). While not part of the docket or record, the Court is aware that Attorney Shrager wrote a letter dated September 27, 2011 (four months prior to jury trial and five days after the *Order* had been signed regarding the Grand Jury transcripts) thanking Assistant District Attorney Darren Newberry for forwarding to him the Grand Jury testimony. This issue is completely meritless.

48

Paragraph 45

In defendant's issue number 45, appellate counsel again alleges that the trial court erred or abused its discretion in granting the Commonwealth's *Motion to Consolidate*. Defendant Duncan did not file a motion to sever, but co-defendant Howard Edward Irwin, Jr. filed such a Motion and all motions were heard during the same proceeding. By *Order of Court* dated October 25, 2011, the Commonwealth's *Motion to Consolidate* was granted and co-defendant Irwin's *Motion to Sever* was denied. (Docket 36). The Court has previously dealt with the consolidation issue in its analysis of *Concise Statement* Paragraphs 5, 6 and 7. The Court relies upon that analysis.

Paragraph 46

*See* Court's analysis of Paragraph 42.

Paragraph 47

Appellate counsel alleges that the trial court erred or abused its discretion in denying in part defendant's *Omnibus Pre-Trial Motion – Motion in Limine #7* and allowing at trial certain testimony of Commonwealth witness Shawn Geletei. (Docket 31, 95). Counsel claims that the use of certain portions of Mr. Geletei's testimony taken at the preliminary hearing on February 2, 2011, should have been disallowed at trial due to their hearsay nature and lack of trustworthiness. (Docket 95). Two statements by Mr. Geletei are said to have been improperly allowed at trial. First, that shortly before the murder, the victim, Newman, seemed paranoid and told Mr. Geletei that he bought a pistol to protect himself from the guy who he beat and robbed of $10,000. Second, that Mr. Geletei stated that Defendant Duncan "[c]ome up to me and asked me if I knew the whereabouts about Newman, if I knew about him ripping that guy off. I told him no. He said he's going to murder him." (Preliminary Hearing Transcript [P.H.T.] 96-100).

49

no rule of law or evidence that precludes the Commonwealth or the defense from calling a witness to testify who is presently incarcerated. Defendant's bald and speculative claim that such witnesses are inherently unreliable due to their status as inmates is improper and without merit.

Paragraph 56

In defendant's issue number 56, appellate counsel alleges that the trial court erred or abused its discretion in denying an *Omnibus Pre-trial Motion – Motion in Limine* pertaining to an interview of Gerald Michaux, Sr. given by Corporal Tobin of the PSP. (Docket 53). The trial court did not rule on the *Motion* at the time it was presented, but rather indicated that it wished to allow the testimony to develop at trial and rule accordingly at the appropriate time. This is a moot issue as the Commonwealth did not call Mr. Michaux as a witness during trial.

Paragraph 57

In defendant's issue number 57, appellate counsel alleges that the trial court erred or abused its discretion in denying an *Omnibus Pre-trial Motion – Motion in Limine* pertaining to an interview of Commonwealth witness Gerald Hull. The *Motion* (Docket 55) raises the issue of Hull's alleged cocaine use at a time relevant to his testimony as made known to defense counsel through Commonwealth discovery. The fact that Hull had been under the influence of cocaine at the time relevant to his statements to Corporal Tobin, and his testimony, does not in and of itself render his statements inadmissible. This information was properly turned over to defense counsel prior to trial and was or could have been used for cross-examination purposes. Credibility and weight of evidence are within the province of the jury as fact-finder and Hull's credibility was challenged by defense counsel for both co-defendants through the use of this information on cross-examination. (T.T. 1353-1375). Alleged drug use at a time relevant to a witness's testimony is a matter of credibility properly left to the jury's consideration. *Commonwealth v. Hudson*, 414 A.2d 1381, 1386 (Pa. 1980).

54

## CONCLUSION

Based on the foregoing, this Court finds that all of the Matters Complained of on Appeal lack merit and the jury verdict was proper, supported by the evidence, and should be upheld.

BY THE COURT:

6/6/13

Debbie O'Dell-Seneca, President Judge

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY
PENNSYLVAIA - CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
VS.                            )    C.A. No.  357 of 2011
)
MICHAEL DUNCAN,                )
            DEFENDANT          )

HEARING/ARGUMENT ON DEF.'S
OMNIBUS PRE-TRIAL MOTIONS ON
OCT. 27, 2011 BEFORE JUDGE JANET
MOSCHETTA BELL IN CTROOM #6.

APPEARANCES:

Darren Newberry and Dennis Popojas
Assistant District Attorneys
Representing the Commonwealth

David S. Shrager, Esq.
Representing the Defendant

## ORDER OF COURT

**AND NOW,** this 31st day of October, 2011, pending before the Court are defendant's Omnibus Pre-Trial Motions in the nature of two (2) Motions to Suppress and seven (7) Motions in Limine filed September 22, 2011 and scheduled for hearing/argument on October 27, 2011.  During the hearing, the Commonwealth presented the testimony of Trooper James Monkelis; retired Corporal Beverly Ashton; and Corporal John Tobin. Based upon the allegations of defendant's Motions; the Commonwealth's Answers; the testimony elicited during hearing and arguments; applicable Pennsylvania Rules of Evidence and pertinent appellate decisions, it is hereby **ORDERED, ADJUDGED and DECREED** as follows:

Pre-Trial Motion - Suppression Motion # 1:

Defendant was orally read his *Miranda* Warnings on June 24, 2003 and he appeared to understand/comprehend them although he refused to sign the waiver and

refused to give tape recorded statements. Defendant made voluntary statements after having been read his *Miranda* Warnings and all such statements are admissible. There is no legal requirement that a defendant waive his *Miranda* warnings in writing for the waiver to be effective. An oral waiver is sufficient. See *Commonwealth v. Williams*, 363 A. 2d 1326 (Pa. Super. 1976).

Therefore, defendant Duncan's Suppression Motion #1 is **DENIED** with the exception that any testimony regarding a polygraph test is prohibited and thereby the Suppression is **GRANTED** to that limited extent.

### Pre-Trial Motion - Suppression Motion # 2:

Defendant was orally read his *Miranda* Warnings on January 14, 2011 at the Police Station in Ohio and appeared to comprehend/understand his *Miranda* Rights; again defendant refused to sign the written waiver but orally waived his rights by stating that he was willing to talk with the officers and he did not wish to call an attorney. Such oral waiver is legal. See *Commonwealth v. Williams, supra.* Eventually defendant stated that he wanted to call an attorney and defendant called an attorney who met with him at the police station. The attorney then advised that the defendant would not answer any questions but would waive extradition from Ohio to Pennsylvania. Therefore defendant Duncan's Motion to Suppress #2 is **DENIED** as to any and all statements made by defendant before asking to speak with an attorney.

During the transportation from Loraine County, Ohio to Washington County, Pennsylvania on January 14, 2011, defendant Duncan initiated conversation with the police officers about a variety of subjects. Defendant Duncan's Motion to Suppress # 2 as to any and all statements made during transportation is **DENIED** except for the question asked by Trooper James Monkelis to the effect of "Did John Newman deserve to be killed or deserve to die?" The Motion to Suppress # 2 is **GRANTED** with regard to this question and defendant's response of silence and/or changing the subject. See *Rhode Island v. Innis*, 446 U.S. 291 (1980).

### Pre-Trial Motions - In Limine # 3 through 9:

Pre-trial Motions:  In Limine # 3:  Upon consideration of the allegations of Motion in Limine # 3 pertaining to co-defendant Bronson's statements/questions to Trooper Borello regarding drug sales/arrests and Bronson's questioning of Borello "asking me who the informant was and things like that. . ."; in consideration that the testimony is offered by the Commonwealth to establish motive and is not offered for the truth of the matters asserted and is not hearsay;

Accordingly, defendant Duncan's Motion in Limine # 3 is **DENIED.**

Pre-Trial Motions:  In Limine # 4:  Upon consideration of the allegations of defendant's Motion in Limine # 4 pertaining to testimony of Trooper Monkelis that Duncan's name was provided to the police as someone who potentially committed the

homicide; in consideration that the testimony is offered by the Commonwealth to explain the course-of-conduct of the police investigation as it pertains to this defendant; is not being offered for the truth of the matter asserted and it is not hearsay; See *Commonwealth v. Dent*, 837 A. 2d 571, 577 (Pa. Super. 2003) quoting *Commonwealth v. Cruz*, 414 A. 2d 1032, 1035 (Pa. 1980).

Therefore, the Commonwealth may introduce such evidence and the Motion in Limine # 4 is **DENIED.**

Pre-Trial Motions: In Limine # 5: Upon consideration of the allegations of defendant's Motion in Limine # 5 pertaining to testimony of Trooper Monkelis that Michael Bowman, a witness in this case, provided the name of Michael Duncan to the police as the person who killed Newman through a letter written by Bowman and mailed to the police; in consideration that the testimony is offered by the Commonwealth to explain the course-of-conduct of the police investigation as it pertains to this defendant and why they focused on Duncan in Loraine, Ohio; in consideration that the Commonwealth is calling Michael Bowman to testify at trial and will be subject to cross-examination; this testimony is not being offered through Trooper Monkelis for the truth of the matter asserted and it is not hearsay. See *Dent* and *Cruz, supra.*

Therefore, the Commonwealth may introduce such evidence and the Motion in Limine # 5 is **DENIED.**

Pre-Trial Motions: In Limine # 6: Upon consideration of the allegations of defendant's Motion in Limine # 6 pertaining to testimony of Trooper Monkelis that he interviewed co-defendant Irwin in June of 2003 and Irwin said that Duncan probably did it; in consideration that the statement is speculative; the Court will hold its ruling in abeyance on this Motion to see how this testimony develops during trial and the Motion is neither **DENIED nor GRANTED.**

Pre-Trial Motions: In Limine # 7: Upon consideration of the allegations of defendant's Motion in Limine # 7 pertaining to statements made by Newman, now deceased, to Shawn Geletei regarding his state of mind prior to his death and Pa. R.E. 801; the Court holds its ruling in abeyance on this part of the Motion to see how this testimony develops during trial and the Motion is neither **DENIED nor GRANTED.**

As to the second portion of defendant's Motion in Limine # 7 pertaining to inculpatory statements allegedly made by defendant Duncan to Shawn Geletei; defendant Duncan's Motion in Limine # 7 is **DENIED.**

Pre-Trial Motions: In Limine # 8: Upon consideration of the allegations of defendant's Motion in Limine # 8 pertaining to statements made by Hull that he knew Duncan through Irwin through drug sales; defendant Duncan's Motion in Limine # 8 is **DENIED.**

Upon consideration of the allegations of defendant's Motion in Limine # 8 pertaining to Hull's testimony that he saw Duncan with a gun in the early morning hours

after the night that Newman was alleged to have been murdered; this testimony establishes that Duncan had access to a gun within a short period of time of the alleged homicide. This portion of defendant Duncan's Motion in Limine # 8 is **DENIED.**

Upon considerations of the allegations that Hull stated that the morning he saw Duncan, Duncan "acted like surprised, giddy and anxious all at once, like he had did something wrong"; defendant Duncan's Motion is Limine # 9 is **DENIED** except to that portion of the statement "like he had did something wrong" as this is opinion testimony rather than testimony as to what the lay witness was able to observe. While a lay witness is permitted to express an opinion on a matter falling within the realm of common knowledge, experience or understanding, and the Court is permitting the testimony that Duncan "acted like surprised, giddy and anxious all at once. . ." the remaining portion of the statement is objectionable. See *Commonwealth v. Boczkowski,* 846 A. 2d 75 (head note 38) (Pa. 2004). The Motion in Limine is **GRANTED** as to this aspect or portion of the testimony only.

Pre-Trial Motions: In Limine # 9: Upon consideration of the allegations of defendant's Motion in Limine # 9 pertaining to witness Tomcanin's statement that co-defendant Irwin allegedly told him that "he had someone pop Newman"; in consideration of Pa. R. E. 803(25) exception to the hearsay rule - admission by party opponent; defendant Duncan's Motion in Limine # 9 is **DENIED.**

**By the Court:**

*Janet Moschetta Bell*
Janet Moschetta Bell, J.